# NATIONAL GRANGE MUTUAL INSURANCE COMPANY *v.* FELIX C. SANTANIELLO ET AL.
## (SC 17961)

Rogers, C. J., and Norcott, Katz, Palmer and Vertefeuille, Js.

Argued October 20, 2008—officially released January 13, 2009

*John H. Van Lenten,* with whom was *John P. Clifford, Jr.,* for the appellants (named defendant et al.).

*John W. Lemega,* with whom, on the brief, was *Elizabeth M. Festa,* for the appellee (plaintiff).

*Opinion*

NORCOTT, J. In this appeal, we consider the relationship between general garage operations insurance coverage and a specific dealer plate endorsement with respect to the coverage of dealer plates affixed to a recently sold used car. The named defendant, Felix C. Santaniello, and the defendant Felix R. Santaniello, administrators of the estate of Elizabeth Santaniello, appeal[1] from the declaratory judgment rendered in favor of the plaintiff, the National Grange Mutual Insurance Company, declaring that it had no duty to defend or indemnify the defendant insureds, Carbone's Auto Body, Inc. (Carbone's), and Nikolas Topintzis, in a wrongful death action brought against them by Felix C. Santaniello and Felix R. Santaniello.[2] On appeal, the defendants claim that the trial court improperly concluded that the garage insurance policy (policy) that the plaintiff had issued to Carbone's did not provide liability coverage for a 1993 Plymouth Voyager (Voyager) operated by Topintzis because: (1) its dealer plate coverage had been deleted by subsequent endorsement; and (2) the garage operations provision of the policy does not extend to the sale of used cars. We affirm the judgment of the trial court.

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The plaintiff also named Carbone's and Topintzis as defendants in this declaratory judgment action. The trial court granted the plaintiff's motion for a default judgment against Carbone's based on its failure to appear. Topintzis appeared pro se before the trial court, but he thereafter filed a bankruptcy petition with the United States Bankruptcy Court for the District of Connecticut, which stayed this action as to Topintzis until February 23, 2006, when it granted Felix C. Santaniello and Felix R. Santaniello's motion for relief from that stay. Hereafter, all references herein to the defendants are to the Santaniellos.

The record, including the trial court's findings in its memorandum of decision, reveals the following facts and procedural history. On May 20, 2003, Topintzis purchased the Voyager from Carbone's for $320. Because Carbone's had not yet obtained the title to the Voyager from its wholesaler, Tony March Buick, Inc., Topintzis could not register it in his own name and operated it pursuant to a loaner agreement that he had entered into with Carbone's on that date.[3] Pursuant to that agreement, the Voyager was equipped with dealer plates, numbered DD 929, which the state had issued to Carbone's pursuant to General Statutes § 14-60 (a).[4]

---

[3] When Topintzis signed the loaner agreement, he represented to Carbone's that he had his own automobile insurance policy from the Government Employees Insurance Company, but that coverage had in fact expired.

[4] General Statutes § 14-60 (a) provides: "No dealer or repairer may rent or allow or cause to be rented, or operate or allow or cause to be operated for hire, or use or allow or cause to be used for the purpose of conveying passengers or merchandise or freight for hire, any motor vehicle registered under a general distinguishing number and mark. No dealer or repairer may loan a motor vehicle or number plate or both to any person except for the purpose of demonstration of a motor vehicle, or when a motor vehicle owned by or lawfully in the custody of such person is undergoing repairs, or when such person has purchased a motor vehicle, the registration of which by him is pending, and in any case for not more than thirty days in any year, provided such person shall furnish proof to the dealer or repairer that he has liability and property damage insurance which will cover any damage to any person or property caused by the operation of the loaned motor vehicle, motor vehicle on which the loaned number plate is displayed or both. Such person's insurance shall be the prime coverage. If the person to whom the dealer or repairer loaned the motor vehicle or the number plate did not, at the time of such loan, have in force any such liability and property damage insurance, such person and such dealer or repairer shall be jointly liable for any damage to any person or property caused by the operation of the loaned motor vehicle or a motor vehicle on which the loaned number plate is displayed. Each dealer or repairer shall keep a record of each loaned number plate showing the date loaned, the vehicle identification number of the vehicle on which such plate is displayed, the date returned and the name, address and operator's license number of the person operating any vehicle with such loaned number plate. Such dealer or repairer shall give a copy of this record to each person to whom such plate or vehicle and plate are loaned which shall be carried in the motor vehicle at all times when operated upon a public highway. This record shall be retained by the dealer or repairer for a period of six months from the

Six days later, on May 26, 2003, Topintzis was operating the Voyager on Interstate 91 heading southbound, and was involved in an accident that injured Felix C. Santaniello and killed Elizabeth Santaniello. Thereafter, the defendants commenced a wrongful death action against Topintzis and Carbone's in the Superior Court for the judicial district of New Britain.

The policy at issue herein was issued by the plaintiff to Carbone's on January 9, 2003, with an effective date of December 12, 2002. According to the trial court's memorandum of decision, the "policy . . . originally insured three rather than four sets of dealer plates for [Carbone's]. Although the application for insurance sought coverage for four sets of dealer plates, the plaintiff learned from Mitchell Marcus, the insurance agent with whom it worked, that the fourth plate would be permanently affixed to a 2000 International truck [a flatbed tow truck].[5] Since the policy separately listed and insured the truck, there was no reason for the policy to cover a fourth dealer plate and it accordingly did not do so. . . .

---

date on which the number plate or motor vehicle or both were loaned and such record shall be available during business hours for examination by any police officer or inspector designated by the Commissioner of Motor Vehicles."

[5] When Marcus applied to the plaintiff for Carbone's policy, he initially requested coverage for four sets of dealer plates and for a 2000 International truck. Marcus testified that there was no indication in the application or policy that any of those four plates were to be permanently affixed to any particular vehicle. Marcus testified that the discrepancy between the policy and the application was because it turned out that three sets of insured dealer plates were floating plates, and the fourth set of dealer plates permanently was assigned to the International truck. Accordingly, Marcus also testified that he had discussed the application with Jeffrey Burns, an underwriter for the plaintiff, and had informed him that one dealer plate was attached to the truck, although that information was not contained in the written application. Marcus did not inform Carbone's that, to be covered properly, the plate assigned to the truck needed to be permanently affixed on the truck, although he made that clear verbally.

"On or about February 2, 2003, the plaintiff deleted coverage of the three dealer plates with the consent or authorization of Carbone's.[6] . . . The court credits the testimony of Jeffrey Burns [an underwriter for the plaintiff] that this deletion meant that there was no longer any separate coverage for dealer plates under the policy.

"Carbone's received notice of this deletion shortly after February 10, 2003, when Marcus mailed to Carbone's the plaintiff's notice of change in policy, along with a covering memo[randum].[7] To be sure, Carbone's already had notice of this change because, as the court has found, Carbone's requested or at least authorized it.[8]

"An inspection conducted on or about February 27, 2003, revealed that, notwithstanding this deletion of coverage with Carbone's approval and knowledge, Carbone's was using 'four dealer plates . . . as floaters . . . primarily on vehicles being towed.' Carbone's was thus not relying on a mistaken belief that the plaintiff

[6] The plaintiff deleted the dealer plate coverage when Marcus, acting on behalf of Carbone's, submitted a memorandum requesting a revised endorsement that removed the three sets of dealer plates from the policy retroactive to December 12, 2002, which the plaintiff issued shortly thereafter. Marcus testified that he was not sure which particular plate number was affixed to the 2000 International truck, and that, because Carbone's did not specify which three plates should be removed from coverage, he similarly did not specify that in his communications with the plaintiff.

[7] Marcus testified that he did not hear from Carbone's again until July, 2003, when it requested that coverage be restored to the three sets of dealer plates because of concerns about this accident. That request, however, was denied.

[8] We note that Alfred Carbone III, the former manager of Carbone's, testified that he had never spoken with Marcus about removing coverage from any of the dealer plates, and denied receiving any communications either from the plaintiff or Marcus to that effect. Carbone also denied asking them to put the plates back on after this accident. The trial court rejected this testimony as not credible, noting that "there would be no economic or other motive for Marcus to request a deletion without the consent of Carbone's, and there are ample economic reasons why Carbone's would request such a deletion."

was insuring one remaining dealer plate. Instead, Carbone's was still using all four plates despite its request to delete coverage for three such plates and the notice it received that the plaintiff had done so. Further, Carbone's was no longer paying, and the plaintiff was accordingly not receiving, a premium for any dealer plates."[9]

Accordingly, the plaintiff brought this action seeking a declaratory judgment that it had no obligation to defend or indemnify Topintzis and Carbone's in the wrongful death action.[10] In the first count of the amended complaint, the plaintiff claimed that the Voyager was not a "covered auto" under the relevant policy provisions. In the second count, the plaintiff claimed that Carbone's had materially misrepresented the nature of its business when it applied for the policy, which would bar coverage thereunder.

After a two day trial, the trial court concluded that the Voyager was not covered under the policy because: (1) the dealer plate endorsement was not in effect at the time of the accident; and (2) the Voyager was not a "covered auto" under the "garage operations" provision of the policy because the sale and lease of used cars is not a use commonly "in connection with," or "necessary or incidental," to Carbone's "repair shop" operations.[11] Accordingly, the trial court rendered a

---

[9] This finding is consistent with both the inspection report and the testimony of Alfred Carbone III that all four dealer plates were "floaters" and none were permanently affixed to any one vehicle. Indeed, Carbone believed that the 2000 International truck was insured separately under the policy, and testified that he did not use a dealer plate on it because it had a separate regular plate permanently affixed to it. He said the dealer plates were used early in 2000 when Carbone's purchased the 2000 International truck, but only temporarily until it was registered with state wrecker plates.

[10] Despite the pendency of this dispute, the plaintiff provided a defense in the underlying wrongful death action pursuant to a reservation of rights.

[11] The trial court noted, inter alia, that garage operations coverage could be available if the Voyager was a "[symbol] twenty-nine 'covered auto' " under the policy, a category that covers "Non-Owned 'Autos' Used In Your Garage Business," defined in relevant part as: "Any 'auto' you do not own,

declaratory judgment concluding that the policy did not provide coverage. This appeal followed.[12]

Before turning to the defendants' specific claims on appeal, we begin with the well established legal principles applicable to insurance coverage disputes, as well as the appropriate standard of review. "[C]onstruction of a contract of insurance presents a question of law for the court which this court reviews de novo. . . . An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract . . . . In accordance with those principles, [t]he determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . Under those circumstances, the policy

---

lease, hire, rent or borrow used in connection with your garage business described in the Declarations. . . ." The trial court concluded that "this type of covered auto must be 'used in connection with [the insured's] garage business described in [the] Declarations.' "

The trial court stated further that the " 'garage business' defined in the declarations of the policy is 'repair shop.' " It compared the statutory definition of " '[r]epairer' " under General Statutes § 14-51 (a) (3), to the definition of " '[u]sed car dealer' " under § 14-51 (a) (2), and concluded that "the statutes define 'used car dealer' to encompass repair work, but do not define 'repairer' to include sale or leasing. For these reasons, the [Voyager] was not used in connection with the repair shop business and was therefore not a [symbol] twenty-nine covered auto." The trial court further noted that, "[a]lthough the evidence revealed that Carbone's was in fact a used car dealership, Carbone's simply did not obtain coverage, and pay the appropriate premium, for a policy that would cover all autos or even autos sold by dealers. Thus, under no theory did the policy provide coverage for the [Voyager]."

[12] The trial court rejected, however, the plaintiff's separate claim that the policy was void because Carbone's had materially misrepresented the nature of its business in its application for coverage. The plaintiff filed a cross appeal from this conclusion, which it withdrew after this appeal was transferred from the Appellate Court to this court. See footnote 1 of this opinion.

is to be given effect according to its terms. . . . When interpreting [an insurance policy], we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result. . . .

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. . . . This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous."[13] (Internal quotation

[13] Put differently, the "policy language will be construed as laymen would understand it and not according to the interpretation of sophisticated underwriters, and . . . ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view. . . . The premise behind the rule is simple. The party who actually does the writing of an instrument will presumably be guided by his own interests and goals in the transaction. He may choose shadings of expression, words more specific or more imprecise, according to the dictates of these interests. . . . A further, related rationale for the rule is that [s]ince one who speaks or writes, can by exactness of expression more easily prevent mistakes in meaning, than one with whom he is dealing, doubts arising from ambiguity are resolved in favor of the latter. . . . This canon, commonly styled contra proferentem, is more rigorously applied in the context of insurance contracts than in other contracts." (Citation omitted; internal quotation marks omitted.) *Israel* v. *State Farm Mutual Automobile Ins. Co.*, 259 Conn. 503, 508–509, 789 A.2d 974 (2002). Ambiguity is determined from the vantage point of the "reasonable layperson in the position of the purchaser of the policy . . . ." (Internal quotation marks omitted.) Id., 509.

marks omitted.) *Zulick* v. *Patrons Mutual Ins. Co.*, 287 Conn. 367, 372–73, 949 A.2d 1084 (2008); see also id., 378 (not considering evidence of insured's subjective intent with respect to desired scope of coverage because policy was clear and unambiguous).

Finally, a trial court's resolution of factual disputes that underlie coverage issues is reviewable on appeal subject to the clearly erroneous standard. See *Holy Trinity Church of God in Christ* v. *Aetna Casualty & Surety Co.*, 214 Conn. 216, 222, 571 A.2d 107 (1990) (whether insureds were engaged in demolition "activities excluded by the policies is a factual question, to which the ordinary rules of appellate review apply"); *ACMAT Corp.* v. *Greater New York Mutual Ins. Co.*, 88 Conn. App. 471, 481–83, 869 A.2d 1254 (sufficiency of evidence to prove existence of insurance policy), cert. denied, 274 Conn. 903, 876 A.2d 11 (2005). Such a "finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [A] finding is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Echavarria* v. *National Grange Mutual Ins. Co.*, 275 Conn. 408, 417–18, 880 A.2d 882 (2005) (whether notice of cancellation of policy was sent subject to clearly erroneous review). Thus, "[i]t is well established that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility

because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom." (Internal quotation marks omitted.) *Ravetto* v. *Triton Thalassic Technologies, Inc.,* 285 Conn. 716, 728, 941 A.2d 309 (2008).

## I

We begin with the defendants' claim that the trial court improperly concluded that the policy did not provide liability coverage for the dealer plates on the Voyager. Specifically, the defendants contend that: (1) the plaintiff failed to execute a clear and unambiguous endorsement that amended the policy to delete the dealer plate endorsement; and (2) even if the policy was amended properly, the original policy provided coverage for four dealer plates, and deleting coverage for three unspecified dealer plates still left coverage on the remaining set. The defendants argue further that this remaining set could have been affixed to the Voyager at the time of the accident, which creates an ambiguity that requires the plaintiff, as the insurer, to bear the burden of resolving the resulting confusion by providing coverage. We address each claim in turn.

## A

We begin with the defendants' claim that the deletion of the dealer plate coverage was not a proper endorsement, and, therefore, did not effectively amend the policy.[14] Relying on *Israel* v. *State Farm Mutual Automobile Ins. Co.,* 259 Conn. 503, 789 A.2d 974 (2002), the defendants contend that the document issued by the plaintiff on February 2, 2003, "[d]eleting three sets

---

[14] We note that the policy provides in relevant part: "This policy contains all the agreements between you and us concerning the insurance afforded. . . . This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy."

of dealer plates," is not a proper endorsement that clearly and unambiguously amended the policy. In response, the plaintiff distinguishes *Israel* and argues that it clearly and unambiguously amended the policy via an endorsement, despite the addendum's failure to use that particular word, because of the messages on the form that was used, as well as the transmission to Marcus and Carbone's of a revised premium balance. We agree with the plaintiff, and conclude that the addendum was an endorsement that clearly and unambiguously deleted dealer plate coverage from the policy.

The record reveals the following additional relevant facts. The total premium for the policy, as originally issued and effective on December 12, 2002, was $14,171, and $7317 of that premium was attributable to the dealer plate endorsement that provided liability and uninsured motorists coverage for the "[three] sets of dealer plates." Indeed, the schedule of covered autos specifically listed the 2000 International truck, coverage for which cost $4756, and also the three dealer plates costing $2439 each for a total of $7317.[15] The dealer plate endorsement itself was printed on form CA 2003 1097, which advised: "This endorsement changes the policy. Please read it carefully."[16] It then provided coverage for, inter alia, customers who had purchased cars, the registration of which had not yet taken effect.[17]

---

[15] Accordingly, the plaintiff issued four insurance identification cards to Carbone's, three for vehicles with "unknown" vehicle identification numbers, and one for the 2000 International truck.

[16] We note that the policy contained other endorsements with similar warning language for Connecticut uninsured and underinsured motorists coverage, glass coverage, a loss payable clause, changes required under Connecticut law, and a nuclear energy liability exclusion.

[17] The dealer plate endorsement provided: "A. This endorsement provides only those coverages where a premium is shown in the Schedule or in the Declarations.

"B. Any 'auto' you operate while used with plates described in this endorsement is a covered 'auto,' but only while:

"1. Used in your garage business;

"2. Used by you or your full-time employees in personal affairs; or

Thereafter, on January 17, 2003, Marcus sent a memorandum to Wendy Paro, an underwriter for the plaintiff, asking her to make the following changes to Carbone's policy, to be effective December 12, 2002: "Delete [three] sets of dealer plates from the above policy, ASAP." On February 2, 2003, the plaintiff sent an addendum to Marcus refunding $7317 to Carbone's and stating: "Description of Change: MTC #1 *Effective 12/12/02—Deleting three sets of dealer plates and form CA2003, which no longer applies.*" (Emphasis added.) Accordingly, on February 10, 2003, Marcus forwarded that addendum to Carbone's, with a cover memorandum stating in relevant part: "Confirming your [recent] request, we have deleted [three] sets of dealer plates from your policy. Attached is the corresponding endorsement."

"A rider or endorsement is a writing added or attached to a policy or certificate of insurance which expands or restricts its benefits or excludes certain conditions from coverage." 2 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 2005) § 18:17, p. 18-24. "When properly incorporated into the policy, the policy and the rider or endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by the parties." Id., p. 18-26. "Because the policy is the contract, the intent to incorporate endorsements and riders into

"3. Loaned to a customer:

"a. For demonstration;

"b. While an 'auto' he or she owns is left with you for service or repair; or

"c. When he or she has bought an 'auto', but its registration has not taken effect.

"C. The insurance provided by this endorsement is excess over any other collectible Liability Coverage and Personal Injury Protection Coverage for any customer using the covered 'auto:'

"1. For demonstration;

"2. While an 'auto' he or she owns is left with you for service or repair; or

"3. When he or she has bought an 'auto', but its registration has not taken effect."

the contract, and thus change its terms, must be made clear. The manner of making an endorsement is immaterial, as long as the intent that it be a part of the contract can be ascertained. Outside papers such as riders and slips must be clearly imported into the policy so as to leave no doubt of the intention of the parties." Id., p. 18-27. Moreover, "[a] later endorsement supersedes a conflicting earlier one." 1 B. Ostrager & T. Newman, Insurance Coverage Disputes (14th Ed. 2008) § 1.01 [a], p. 10.

We recently discussed the use of endorsements in *Israel* v. *State Farm Mutual Automobile Ins. Co.*, supra, 259 Conn. 507, wherein we concluded that an umbrella insurance policy was ambiguous because its provisions were "inconsistent regarding the consequences of the [plaintiff insured's] failure to maintain the underlying coverage required by the policy."[18] We concluded that the "provisions conflict[ed], creating an uncertainty as to the status of the umbrella coverage when the underlying coverage is not maintained and rendering the policy

---

[18] The umbrella policy in *Israel* contained conflicting provisions. First, it contained an "umbrella booklet," which provided in relevant part: " 'All insurance listed in the Declarations must be maintained at all times. The limits listed in the Declarations are the minimum you must maintain. If the required underlying limits are not maintained, you will be responsible for the underlying limit amount of any loss' " *Israel* v. *State Farm Mutual Automobile Ins. Co.*, supra, 259 Conn. 508. It also contained an "uninsured addendum" that provided in relevant part: " 'You must maintain underlying limits for uninsured motorist motor vehicle coverage equal to the limits listed in the Declarations. If these underlying limits are not maintained, this coverage will not apply' " Id. We observed that, "[t]he 'Your Duties to Us' provision of the umbrella booklet and the 'Coverage U' section of the uninsured addendum provide the [defendant insurer] with inconsistent remedies for the [plaintiff insured's] failure to maintain the requisite underlying insurance on his automobile. The first provision indicates that in the event of an insured's failure to maintain underlying coverage, the insured will be responsible for any loss up to the amount of the required underlying coverage before the umbrella coverage takes effect. The latter provision provides that the insured forfeits umbrella coverage completely if he or she does not maintain the requisite underlying coverage." Id., 509.

ambiguous," and required "that the policy must be construed so as to provide [the plaintiff insured] with coverage." Id., 508. In so concluding, we rejected the defendant insurer's argument that the "uninsured addendum," which provided that the failure to maintain the underlying coverage would completely vitiate the umbrella coverage, was an "endorsement . . . [that] controls other, more general policy provisions" because "[i]t is clear from the text of the policy that when the [defendant insurer] issued a policy endorsement, they explicitly labeled the endorsement as such. There are two endorsements in the policy at issue in the present case, and they are entitled, respectively, 'Policy Endorsement' and 'Amendatory Endorsement.' In accordance with their status as policy endorsements, these sections clearly and unambiguously indicate to the reader that their terms supersede other terms in the policy. In contrast, the word endorsement does not appear in the uninsured addendum, and . . . that addendum in no way suggests that its terms control over other policy terms."[19] Id., 510–11.

We conclude that *Israel* is distinguishable from the present case, despite the fact that the subsequent endorsement that deleted the original dealer plate endorsement did not use the formal amendatory language or labeling utilized in the endorsements initially attached to the policy. See footnote 16 of this opinion

---

[19] We also rejected the defendant insurer's argument that the language of the uninsured addendum "clearly indicates to the reader that the condition contained therein is specific to that section and thus controls over the more general 'Your Duties to Us' provision in the umbrella booklet." *Israel* v. *State Farm Mutual Automobile Ins. Co.*, supra, 259 Conn. 511. We concluded that "the use of the phrase '[a]ll other provisions of this policy apply,' without accompanying language indicating that the provisions of the 'Coverage U' section control over other generally applicable policy provisions, exacerbates the ambiguity by seemingly giving effect to the conflicting language in the umbrella booklet, leaving no basis for the [insured] to determine which provision is applicable." Id., 511–12.

and the accompanying text. In *Israel*, the conflicting provisions at issue were confusing because they both could be read as presently effective. In contrast, the deletion endorsement herein makes absolutely clear and unambiguous that it is deleting both the dealer plate endorsement printed on form CA 2003 *and* the three sets of dealer plates, as well as crediting back the relevant portion of the premium. A review of the initial schedule of covered autos makes clear that the policy initially covered a 2000 International truck and three sets of unidentified dealer plates. By way of comparison, the amended schedule of covered autos, issued with the endorsement that deleted the dealer plate coverage, lists only the 2000 International truck as still covered. Thus, the deletion endorsement at issue herein clearly and unambiguously effectuated a change to the underlying policy by deleting the floating dealer plate coverage in its entirety.

## B

Having determined that the dealer plate endorsement properly was deleted from the policy via the subsequent endorsement, we next address the defendants' claim that the trial court improperly concluded that the policy initially provided coverage only for three, rather than four dealer plates.[20] Specifically, the defendants rely on the entry on the application requesting coverage for four dealer plates, and contend that the policy initially insured four dealer plates, meaning that the cancella-

---

[20] The defendants also contend in passing that, because the parties agreed that there were four dealer plates, the trial court improperly decided an issue not before it; see, e.g., *Sabrowski* v. *Sabrowski*, 282 Conn. 556, 560–61, 923 A.2d 686, aff'd after remand, 105 Conn. App. 49, 935 A.2d 1037 (2007); in determining that there were only three dealer plates insured by the policy. This claim is without merit. The trial court, in its province as fact finder in this factually complicated case, necessarily had to resolve discrepancies between the application and the policy, as well as the witnesses' testimony. Determining the allotment of the dealer plates between floaters and the International truck was a necessary part of that task.

tion of coverage for three plates left one unidentified plate still covered, which then would require the plaintiff to extend coverage to the dealer plate on the Voyager. They argue that the ambiguity in the application should be resolved in favor of affording coverage because there are four sets of dealer plates, four entries on the declaration for which a premium was paid on the schedule of covered autos, and only three plates in the dealer plate endorsement, meaning that the policy is ambiguous with respect to the number of plates covered. The defendants further note the distinction between dealer plates authorized by § 14-60 (a); see footnote 4 of this opinion; and those ordinarily affixed to a vehicle, and contend that the dealer plates are intended to be moved between vehicles.

In response, the plaintiff contends that the number of insured plates was a "central issue at trial," and emphasizes that it never conceded that coverage existed for the fourth set of dealer plates independent of the 2000 International truck. It contends that those plates were covered solely by virtue of their status as affixed to the truck. Thus, the plaintiff argues that the policy clearly and unambiguously limited coverage to "[three] sets of dealer plates" as described in the dealer plate endorsement, prior to its deletion. We agree with the plaintiff.

A review of the "schedule of covered auto[s] you own" in the initial policy makes clear that the policy, with the dealer plate endorsement, covered the 2000 International truck registered in Connecticut and three unidentified Connecticut plates. The premium for the truck is $4756 and the three unidentified plates cost $2439 each to insure—a total of $7317. Reading this schedule in conjunction with the dealer plate endorsement, which provides liability coverage for $7020 and uninsured motorists coverage for the three plates for $297—a total of $7317, makes clear and unambiguous

the policy's coverage of only three floating dealer plates—coverage that was deleted in its entirety by the subsequent endorsement.[21] See part I A of this opinion. The trial court, therefore, properly concluded that the policy never provided coverage for a fourth floating dealer plate.

We disagree with the defendants' reliance on the application entry seeking coverage for four dealer plates. When there is a discrepancy between the application and the policy, "the policy, not including the application, is considered to embody the contract of the parties." 3 E. Holmes, Appleman on Insurance (2d Ed. 1998) § 15.17, p. 269; see also id. (application "is usually given great weight in determining the intention of the parties, particularly where the insurance contract is sought to be reformed"); 2 L. Russ & T. Segalla, supra, § 21.25, pp. 21-47 through 21-48 ("[i]f there is an irreconcilable conflict between an application and the policy proper, the latter ordinarily is regarded as controlling").

Moreover, to the extent that the application entry is relevant given the unambiguous policy terms, the extrinsic evidence credited by the trial court readily indicates that the dealer plate coverage was never for more than three floating plates. The application as reviewed by Burns, the plaintiff's underwriter, indicates that the plaintiff contemplated that the policy was to cover four dealer plates: "[three] floaters and one is on the vehicle listed on the auto application—the 2000 International [truck]."[22] Burns' handwritten notes from

---

[21] We disagree particularly with the defendants' argument that the endorsement deleted only three dealer plates, leaving coverage for one set of plates. The language on the endorsement, specifically, its reference to *"and form CA 2003,"* in conjunction with the "three sets of dealer plates," makes clear that the endorsement deleted all coverage of that nature. (Emphasis added.)

[22] Burns observed at trial that the policy charged separately for the fourth plate, which was affixed to the 2000 International truck. He stated, however, that this was only for the purpose of calculating premiums, and that the policy did not require any particular plate to be affixed to the truck permanently.

January 6, 2002, noting the existence of "[four] dealer plates," and stating, "[p]er agent—[one] dealer plate on the truck,"[23] further support this conclusion. Indeed, Burns testified consistently at trial as well,[24] permitting the trial court to conclude that the parties intended the policy to insure no more than three floating dealer plates, prior to its amendment deleting that coverage. See *Ceci* v. *National Indemnity Co.*, 225 Conn. 165, 168–69, 622 A.2d 545 (1993) (construing policy "from the perspective of a reasonable layperson in the position of the purchaser of the policy" and noting that underwriter preparing underinsured motorist endorsement "had considerable information about the insured," namely, that it was small family owned and operated business). Thus, keeping in mind that the appropriate viewpoint from which to read the policy and view the circumstances of its procurement is that of the insured, rather than an injured party seeking to collect from that insured; see, e.g., *Israel* v. *State Farm Mutual Automobile Ins. Co.*, supra, 259 Conn. 509; we agree with the trial court that the policy did not insure the dealer plate that was on the Voyager.

II

The defendants next claim that the trial court improperly concluded that the accident did not result from "garage operations," because the statutory definition of " 'repair shop' " under General Statutes § 14-65e contemplates used car sales and the loan of vehicles as " 'operations necessary or incidental to [that] busi-

---

[23] The notes state further that the "insured keeps the dealer plates as [they are] cheap to keep but impossible to get."

[24] Burns did note, however, that the February 27, 2003 insurance inspection report reflected that all four of the dealer plates were used as floaters at that time. He disagreed, however, with this portion of the report, based on what Marcus had told him about one of the plates being affixed to the truck, and elected to believe Marcus over the content of the report. He did not seek further clarification from Carbone's on this topic, though.

ness,' " under the " '[g]arage operations' " provision of the policy. In response, the plaintiff contends that the sale of used cars was "not necessary or incidental" to Carbone's auto repair business, thereby precluding coverage under the " '[g]arage operations' " clause under case law interpreting and applying such policy language. We agree with the plaintiff, and conclude that the policy's garage operations coverage does not cover the use of the dealer plates on the Voyager sold by Carbone's.

As noted by the trial court, the policy provides liability coverage for "covered autos" enumerated in § I of the policy, namely, symbol twenty-seven, "Specifically Described 'Autos,' " symbol twenty-eight, "Hired 'Autos' Only," and symbol twenty-nine, "Non-Owned 'Autos' Used In Your Garage Business." Section II A of the policy, which provides that liability coverage, states that the plaintiff "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies caused by an 'accident' and resulting from *garage operations* other than the ownership, maintenance or use of covered 'autos.' "[25] (Emphasis added.)

The defendants do not seriously dispute the trial court's conclusion that the Voyager may only be considered a "covered auto" for purposes of the garage operations policy under symbol twenty-nine, "Non-Owned 'Autos' Used In Your Garage Business."[26] That definition

---

[25] Similarly, for garage operations coverage for "other than covered 'autos,' " § II A of the policy provides in relevant part that the plaintiff "will pay all sums an 'insured' legally must pay because of 'bodily injury' or 'property damage' to which this insurance applies caused by an 'accident' and resulting from 'garage operations' other than the ownership, maintenance or use of covered 'autos'."

[26] As noted previously, the trial court concluded that the Voyager was not a "covered auto" under the definitions of symbols twenty-seven and twenty-eight. See footnote 11 of this opinion. The defendants contend perfunctorily, in a footnote in their brief, that the trial court's conclusion with respect to symbol twenty-eight, "Hired 'Autos Only,' " was improper. The policy defines

provides that "Non-Owned 'Autos' Used In Your Garage Business" are "[a]ny 'auto' you do not own, lease, hire, rent or borrow *used in connection with your garage business* described in the Declarations. This includes 'autos' owned by your 'employees' or partners (if you are a partnership), members (if you are a limited liability company), or members of their households while used in your garage business." (Emphasis added.) According to the garage policy declarations, Carbone's is considered a "repair shop" for coverage purposes as a "garage business."

The policy defines " '[g]arage operations' " as "the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. 'Garage operations' [include] the ownership, maintenance or use of the 'autos' indicated in SECTION I of this Coverage Form as covered 'autos'. *'Garage operations' also include all*

"Hired 'Autos Only' " under symbol twenty-eight as: "Only those 'autos' you lease, hire, rent or borrow. This does not include any 'auto' you lease, hire, rent or borrow from any of your 'employees' or partners or members of their households." The trial court concluded that the Voyager was not covered under symbol twenty-eight because there were no "indicia of a loan" from Tony March Buick, Inc. to Carbone's since Carbone's had obtained the vehicle from Tony March Buick, Inc. only after paying a negotiated wholesale price for it, with the intention of reselling it, and the title documents "simply trailed the actual exchange of ownership, a situation recognized by law."

The defendants, however, rely on General Statutes § 38a-363 (d), which defines, for purposes of the financial responsibility statutes, " '[o]wner' of a private passenger motor vehicle" as "the person who owns the legal title thereto, except where the motor vehicle is the subject of a security agreement or lease with option to purchase with the debtor or lessee having the right to possession, in which event 'owner' means the debtor or lessee." Even assuming the defendants' briefing of this claim to be adequate, we disagree with this claim for substantially the same reasons advanced by the trial court. See *DeRubbo* v. *Aetna Ins. Co.,* 161 Conn. 388, 393–94, 288 A.2d 430 (1971) (notwithstanding dealer's failure to provide customer with certificate of title in accordance with motor vehicle statutes, possession and title passed to customer in accordance with Uniform Commercial Code when customer operated car, with dealer plates, for several weeks and paid for it in full).

*operations necessary or incidental to a garage business.*" (Emphasis added.) Accordingly, a significant threshold issue with respect to this claim on appeal is whether the provision of dealer plates for used cars that it has sold, prior to their registration by their purchasers, is "necessary or incidental" to Carbone's "repair shop" business.

The policy's definition of " '[g]arage operations' " as "all operations necessary or incidental to a garage business" is one of broad applicability. With respect to the word incidental, that term in "ordinary speech" "means subordinate, nonessential, occurring merely by chance or without intention or calculation, or being likely to ensue as a chance or minor circumstance." *Lumbermens Mutual Casualty Co.* v. *Pennsylvania National Mutual Casualty Ins. Co.*, 70 N.C. App. 742, 745, 321 S.E.2d 10 (1984); id., 744–46 (answering service call on highway to help start recently repaired truck was "incidental" to garage operations). Similarly, necessary in this context has been defined as "indispensable to some purpose; something that one cannot do without; a requisite, an essential." (Internal quotation marks omitted.) *North Carolina Farm Bureau Mutual Ins. Co.* v. *Weaver*, 134 N.C. App. 359, 362, 517 S.E.2d 381 (1999); id., 363 (shooting not covered under policy because self-help attempt at repossessing car with unpaid repairs was not " 'necessary or incidental' " to repair shop operations). Thus, "whether an accident arose out of the operation of a service station must depend upon the circumstances of the particular case, the nature of the transaction, its connection with the business and whether it can be said to be a natural and necessary incident or consequence of the operation of the service station even though not a foreseen or expected consequence of that operation." (Internal quotation marks omitted.) *Rinehart* v. *Anderson*, 985 S.W.2d 363, 370 (Mo. App. 1998); id. (in context of motion for summary judgment, jury could find that

activity of refueling garage van after returning repaired vehicles to customers is " 'necessary or incidental' " to repair shop's garage operations); see also *Northland Ins. Co.* v. *Boise's Best Autos & Repairs*, 132 Idaho 228, 234, 970 P.2d 21 (App. 1997) (activity of unloading advertising materials for pawn shop that accepted used cars to be sold by associated dealer was incidental to garage operations of that dealership); *American Hardware Mutual Ins. Co.* v. *Darv's Motor Sports, Inc.*, 427 N.W.2d 715, 718 (Minn. App. 1988) (child's operation of motorbike was for "promotional purposes" of her parents' shop and therefore "incidental to garage operations").

At first glance, then, it seems that the broad "necessary or incidental" language of the garage operations clause in the policy might well serve to provide liability coverage in the present case, particularly if we were to assume, without deciding, that the trial court improperly determined that the sale of used cars is not by itself an activity "incidental" to the garage operations of a "repair shop,"[27] as Carbone's is described on the policy declaration.[28] See footnote 11 of this opinion

---

[27] Cf. *Julien Moore R-W Associates, Inc.* v. *New Hampshire Ins. Co.*, 122 N.H. 328, 333, 444 A.2d 543 (1982) ("[i]t is not uncommon for motor vehicle service stations and automobile repair shops to engage in the rental of trucks and automobiles, and a reasonable person could conclude that such rental activities are incidental to the garage operations").

[28] We need not, therefore, consider the parties' statutorily based arguments with respect to whether the commonly understood definition of repair shop encompasses the sale of used vehicles. We note, however, that the extent to which Carbone's is a used car dealer, which the plaintiff would not have insured, rather than the repair shop contemplated by the policy, was a hotly contested factual issue before the trial court with respect to the plaintiff's material misrepresentation claims. Marcus, the insurance agent, testified that he was not aware that Carbone's sold cars in the scope of its garage operations, and that he would not have submitted the application to the plaintiff had he been aware that it was a used car dealer. Carbone's, however, had a used car dealer's license in December, 2002, and sold approximately 200 cars in 2003. Alfred Carbone III testified that he did not tell Marcus about this aspect of the business or provide copies of the license because Marcus did not ask.

and accompanying text. Indeed, the provision of dealer plates to a customer who has recently purchased a car, but has not yet registered it, has been held to be necessary or incidental to the garage operations of those engaging in the sale of vehicles. See *Aetna Casualty & Surety Co.* v. *A.L.J.A., Inc.*, 905 F. Sup. 36, 43 (D. Mass. 1995) (provision of dealer plates to prospective purchaser of used vehicle, when sale could not be finished because of missing title certificate, was " 'necessary or incidental' " to merchant's garage operations to "salvag[e] its goodwill and . . . eventually complet[e] the deal"); *Hartford Ins. Group* v. *Rubinshteyn*, 66 N.Y.2d 732, 734, 488 N.E.2d 98, 497 N.Y.S.2d 352 (1985) ("[T]he only way [the purchaser] could lawfully drive the vehicle before having obtained his own license plates was with [the] [g]arage's plates attached. Therefore, in permitting [the purchaser] to use the dealer plates . . . [the] [g]arage was rendering a service to its customer that constituted an act 'necessary or incidental' to its business . . . ." [Citations omitted.]); cf. *McLeod* v. *Nationwide Mutual Ins. Co.*, 115 N.C. App. 283, 292–93, 444 S.E.2d 487 (placement of dealer tags on

Indeed, Burns testified that the plaintiff would not have issued the policy had it been aware that Carbone's was a licensed used car dealer, and stated that, when the plaintiff issued the policy, Burns had understood Carbone's to be an auto repair facility working on cars and light trucks. Burns explained that the plaintiff did not become aware that Carbone's was not simply a repair shop until March, 2003, when he received an insurance inspection report that he had ordered about its operations to determine whether the auto body name was a misnomer, given that the plaintiff did not insure body shops. He concluded, based on the report, that the policy should not be renewed because Carbone's sold approximately fifty cars per year, and the plaintiff did not write coverage for auto body shops or used car dealers in 2003, despite the fact that Carbone's already had cancelled coverage on three of the dealer plates. The plaintiff determined that it would be difficult to cancel the policy because more than sixty days had passed from the effective date, so it elected for nonrenewal in the future rather than cancellation at that time. Because of our conclusion with respect to the coverage provided by the policy, even assuming the primary operations of Carbone's to be the sale of used vehicles, we need not, however, consider the resolution of these factual questions in any detail.

car not "necessary or incidental" to garage operations when vehicle was not needed by dealer personnel for travel or operated by "prospective dealership customer such that his use of the tag furthered customer goodwill"), review denied, 337 N.C. 694, 448 S.E.2d 528 (1994).

Nevertheless, the broad "necessary or incidental" clause does not necessarily mean that the policy's garage operations provision will extend to cover the dealer plates on the Voyager in this case. The only two cases that we have found wherein dealer plate coverage was extended via the "necessary or incidental" garage operations definition have "covered auto" descriptions that are broader than the symbol twenty-nine definition at issue herein. Indeed, the policies at issue in those cases defined "covered auto" most broadly, namely, as "*any* auto" or "*any* motor vehicle . . . ." (Emphasis added; internal quotation marks omitted.) See *Aetna Casualty & Surety Co.* v. *A.L.J.A., Inc.*, supra, 905 F. Sup. 39 (motor vehicle hazard coverage extends to " 'any motor vehicle for the purpose of garage operations' "); *Hartford Ins. Group* v. *Rubinshteyn*, supra, 66 N.Y.2d 733–34 (" 'covered auto' is expressly defined to include 'any auto,' as distinguished from . . . other descriptions of 'covered autos' contained in . . . the policy").

Moreover, our research reveals that other courts have concluded that the "necessary or incidental" policy language does not provide coverage when the policyholder had, but failed to exercise, the opportunity to purchase more appropriately tailored coverage. Thus, we find persuasive the plaintiff's reliance on the United States Court of Appeals for the Eighth Circuit's recent analysis in *Lindsay* v. *Safeco Ins. Co. of America*, 447 F.3d 615, 618–19 (8th Cir. 2006), wherein that court rejected an argument that the sale of an all-terrain vehicle was " 'necessary or incidental' " to a repair shop's garage operations. The court declined to extend the policy

language this far, noting that the shop owner had the opportunity to elect coverage that clearly would have included "Dealer's Autos and Autos Held for Sale by Non-Dealers," but declined to do so. (Internal quotation marks omitted.) Id., 619. Similarly, in *American Economy Ins. Co.* v. *Otte*, 869 S.W.2d 179, 181 (Mo. App. 1993), the court rejected an attempt to extend the " 'necessary or incidental' " clause to the sale of a dune buggy by a repair shop, noting that, although "the established rule is to construe in favor of coverage . . . that rule is inapplicable where the policy form clearly provides the insured an opportunity to obtain the specific coverage claimed for an additional premium." (Citation omitted.)

Thus, in the present case, Carbone's had the opportunity to purchase dealer plate coverage that appropriately would have covered the risks presented by the use of such plates in the sale of used cars.[29] See *Toker* v. *Hartford*, 60 App. Div. 2d 251, 257, 400 N.Y.S.2d 85 (1977) (rejecting argument that dealer plate endorsement provides coverage only until vehicle is sold because "of the common practice of permitting buyers to drive a car with dealer plates for a few days, and the common understanding that during that period the buyer is covered by the dealer's insurance"). Indeed, Carbone's did in fact exercise its right to purchase such coverage, and then promptly acted to eliminate that coverage from its policy. See part I A of this opinion. Accordingly, we conclude that the garage operations portion of the policy does not provide coverage for Topintzis' operation of the Voyager with dealer plates.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[29] Similarly, like the repair shop in *Lindsay* v. *Safeco Ins. Co. of America*, supra, 447 F.3d 619, Carbone's could have, but did not, purchase coverage under symbol thirty-one, which defines, as a "covered auto," "Dealers 'Autos' And 'Autos' Held For Sale By Non-Dealers Or Trailer Dealers."