LIBERTY MUTUAL INSURANCE COMPANY *v.*
LONE STAR INDUSTRIES, INC.,
ET AL.
(SC 18199)

Norcott, Palmer, Vertefeuille, Sullivan and Sheldon, Js.

Argued December 4, 2008—officially released March 24, 2009

*Charles D. Ray*, with whom were *Charles T. Lee, Jennifer A. Black, James F. DeDonato* and, on the brief, *Catherine A. Mohan, Jennifer B. Strutt, Frank H. Griffin III*, pro hac vice, and *Philip W. Vogler*, for the appellant (named defendant).

*Robert L. Hoegle*, pro hac vice, with whom were *Christopher P. Kriesen* and, on the brief, *Scott D. Camassar, Kenneth G. Williams, Mary S. Diemer* and *Timothy J. Fitzgibbon*, for the appellee (plaintiff).

*Donna M. Greenspan*, pro hac vice, with whom were *Joseph R. Geoghegan* and, on the brief, *Mark B. Seiger, Charles F. Gfeller* and *David S. Samuels*, for the appellee (defendant TIG Insurance Company).

*Charles A. DeLuca*, with whom, on the brief, were *Joseph J. Arcata III* and *Michael C. Modansky*, for the appellees (defendant Granite State Insurance Company et al.).

*Charles L. Kerr*, pro hac vice, with whom, on the brief, were *Sarah C. Rosell*, pro hac vice, *Ryan W. Borho*, pro hac vice, and *Jeffrey J. Tinley*, for the appellees (defendant Hartford Accident and Indemnity Company et al.).

*Stuart D. Rosen*, with whom, on the brief, was *Donald J. Marchesseault*, for the appellees (defendant Travelers Casualty and Surety Company et al.).

*Cristin E. Sheehan*, with whom, on the brief, was *Darren E. Sinofsky*, for the appellee (defendant Agricultural Excess and Surplus Insurance Company).

*Opinion*

NORCOTT, J. In this appeal, we consider numerous insurance coverage issues arising from asbestos and silica related injury and illness claims made against the named defendant, Lone Star Industries, Inc. (Lone Star),[1] in the wake of a settlement agreement entered into during its bankruptcy reorganization proceedings. The plaintiff, Liberty Mutual Insurance Company, brought this declaratory judgment action, pursuant to General Statutes § 52-29 and Practice Book § 17-54, against Lone Star and numerous codefendant insurance companies[2] that had issued liability policies covering

[1] Lone Star is now known as Buzzi Unicem USA.

[2] The insurance companies originally named as defendants are: ACE American Insurance Company (ACE American); Agricultural Excess and Surplus Insurance Company (Agricultural Excess); American Excess Insurance Association (American Excess); American Home Assurance Company (American Home); American Insurance Company (American Insurance), which was formerly known as CIGNA Insurance Company; Century Indemnity Company (Century); Continental Casualty Company; Continental Insurance Company; Employers Insurance of Wausau (Employers Insurance); Federal Insurance Company (Federal); First State Insurance Company (First State); Government Employees Insurance Company (GEICO); Granite State Insurance Company (Granite State); Hartford Accident and Indemnity Company (Hartford Accident); Hartford Casualty Insurance Company (Hartford Casualty); Highlands Insurance Company (Highlands); Home Insurance Company; Lexington Insurance Company (Lexington); Meadows Syndicate, Inc.; Mount McKinley Insurance Company; National Casualty Company (National Casualty); National Union Fire Insurance Company of Pittsburgh (National Union); New England Insurance Company (New England); Northbrook Excess and Surplus Insurance Company; Northern Assurance Company of America (Northern Assurance); North Star Reinsurance Corporation; Old Republic Insurance Company; Republic Insurance Company (Republic); Standard Fire Insurance Company (Standard Fire); TIG Insurance Company (TIG); Transco Syndicate # 1, Ltd.; Travelers Casualty and Surety Company (Travelers); Twin City Fire Insurance Company (Twin City); Underwriters at Lloyd's of London (Lloyd's of London); Western Employers Insurance Company; and Zurich International (Bermuda) Ltd. (Zurich). We refer to these defendants individually by name where appropriate, and collectively as the defendants.

Lone Star, to determine the coverage available for certain asbestos and silicosis claims brought against it. On appeal,[3] Lone Star contends, inter alia,[4] that the trial court improperly granted numerous defendants' motions for summary judgment because there were genuine issues of material fact with respect to the applicability of the policy exclusions upon which they relied. We agree with Lone Star's claims in part, and conclude specifically that the trial court improperly granted the motions for summary judgment filed by American Home, Hartford Accident and National Union. We dismiss Lone Star's appeal with respect to TIG for lack of a final judgment. We further conclude that a remand to the trial court is necessary to determine a question

Not all of the defendants are participants in this appeal. First, the plaintiff has withdrawn this action with respect to ACE American, American Insurance, American Excess, Employers Insurance, Federal, Republic and GEICO. Second, because of a lack of final judgment, Lone Star has withdrawn its claims on appeal with respect to Lloyd's of London. Thus, as acknowledged by Lone Star at oral argument before this court, there are nine defendants that obtained full summary judgment and are participants in this appeal, namely, Agricultural Excess, American Home, First State, Granite State, Hartford Accident, Hartford Casualty, Lexington, National Casualty and National Union. See also Practice Book § 61-3 ("[a] judgment disposing of only a part of a complaint, counterclaim, or cross complaint is a final judgment if that judgment disposes of all causes of action in that complaint, counterclaim, or cross complaint brought by or against a particular party or parties").

We note that Lone Star also has raised claims on appeal with respect to the trial court's 2007 decision on the summary judgment motion filed by TIG. These claims present, however, various issues with respect to the subject matter jurisdiction of both this court and the trial court, which are addressed in part II of this opinion.

[3] Lone Star appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[4] Lone Star raises claims on appeal arising from trial court memoranda of decision rendered in December, 2005, and January, 2007. Prior to the transfer of this appeal to this court; see footnote 3 of this opinion; the Appellate Court dismissed this appeal insofar as it pertains to the 2005 memorandum of decision. Accordingly, we address only those claims arising from the 2007 memorandum of decision. See also footnote 25 of this opinion and the accompanying text.

of subject matter jurisdiction, namely, whether the coverage claims under the excess policies issued by Lexington are ripe for judicial review. Accordingly, we reverse in part the judgment of the trial court and remand the case to that court for further proceedings.

The record reveals the following undisputed factual background and procedural history. On December 10, 1990, Lone Star, a producer of various materials containing silica, such as sand, cement and ready-mixed concrete, filed a voluntary petition for reorganization pursuant to chapter 11 of the United States Bankruptcy Code; 11 U.S.C. § 1101 et seq.; in the United States Bankruptcy Court for the Southern District of New York (New York bankruptcy court). Prior to that date, various claims and actions had been filed against Lone Star and other potentially responsible parties, alleging latent bodily injury and sickness claims arising from "exposure[s] to respirable free silica and/or silica-containing products" that Lone Star had used, manufactured, sold or distributed. Similar claims have been asserted against Lone Star arising from its use, manufacture, sale or distribution of asbestos containing products.

Between January 1, 1972, and January 1, 1991, the plaintiff issued numerous blanket liability policies to Lone Star, as well as a comprehensive general liability policy in 1991.[5] From January 1, 1986, through January 1, 1991, the plaintiff also provided numerous umbrella and excess liability policies to Lone Star, to cover sums in excess of a self-insured retention amount. The various defendants; see footnote 2 of this opinion; also had issued numerous comprehensive and excess liability insurance policies to Lone Star both before and after the filing of its bankruptcy petition.

---

[5] On January 23, 1991, the plaintiff and Lone Star entered into a further agreement, approved by the New York bankruptcy court, under which the plaintiff provided comprehensive liability and umbrella coverage to Lone Star.

Thereafter, the plaintiff and Lone Star, along with Helmsman Management Services, Inc. (Helmsman), a claims administrator, entered into an agreement, approved by the New York bankruptcy court on April 6, 1994 (1994 settlement agreement), to resolve various outstanding coverage and premium disputes relating to those policies issued by the plaintiff to Lone Star prior to the bankruptcy filing. Under the 1994 settlement agreement, the plaintiff agreed to release Lone Star from all current and future obligations with respect to the policies issued prior to the bankruptcy filing, except for "[s]ubsequent [s]ilicosis [c]laims" arising after the 1994 settlement agreement, "[p]ollution [c]overage" and "obligations under this [a]greement." The 1994 settlement agreement also provided that, under the final plan of reorganization approved by the New York bankruptcy court, Lone Star would allow for a general unsecured claim as to the plaintiff in the amount of approximately $5.7 million, with the proceeds from that claim to be transferred to an account (fund) for the purpose of the administration, investigation, defense and indemnity of "[f]uture [s]ilicosis [c]laims." "Future [s]ilicosis [c]laims" were defined essentially as silicosis claims filed after the 1994 settlement agreement, but arising from prepetition exposure.[6]

The 1994 settlement agreement further defined those silicosis claims that would be asserted against Lone Star *after* the exhaustion of the fund as "[s]ubsequent

[6] Specifically, the 1994 settlement agreement defined "[f]uture [s]ilicosis [c]laims" as "additional silicosis claims [arising] after the effective date of this [settlement] [a]greement, which claims will similarly arise out of the claimants' alleged [prepetition] exposure to silica and in connection with Lone Star's [prepetition] sale of sand for blasting operations and/or in connection with the claimants' [prepetition] use of other silica related products or silica related operations. Those silicosis claims which are not reported to the [d]ebtors or to any of their insurers as of the effective date of this [a]greement are hereinafter referred to as '[f]uture [s]ilicosis [c]laims' . . . ."

[s]ilicosis [c]laims,"[7] which are the claims that are at issue in this appeal. Subsequent silicosis claims were to "be handled by Lone Star's insurers pursuant to the terms and conditions of Lone Star's applicable insurance policies and, unless discontinued by the participating insurance carriers, pursuant to the current arrangement among the carriers with respect to [p]rior [s]ilicosis [c]laims (the '[c]urrent [i]nsurance [a]rrangement'). Subsequent [s]ilicosis [c]laims will be handled pursuant to the insurance programs, subject to the terms and conditions thereof, but Lone Star shall be liable in the future only for insurance premiums generated under the terms of the 1991 [p]olicy. [The plaintiff] shall not bill or collect from Lone Star any additional silicosis related premium generated under any [prepetition] policy, provided that [s]ubsequent [s]ilicosis [c]laims are allocated to policies consistent with [the plaintiff's] current practice and are handled among Lone Star's insurers consistent with the [c]urrent [i]nsurance [a]rrangement." Under the "[c]urrent [i]nsurance [a]rrangement," the insurance carriers had shared indemnity obligations to Lone Star on a pro rata basis from the date of the claimant's first exposure through the date the injury or illness manifested.

Since the bankruptcy petition date, thousands of silica related claims have been filed against Lone Star. Helmsman has administered, defended or settled hundreds of future silicosis claims since the date of the creation of the fund and the date of Lone Star's reorgani-

[7] Specifically, the 1994 settlement agreement defined "[s]ubsequent [s]ilicosis [c]laims" as, in relevant part, "[s]ilicosis claims initially reported, either orally or in writing, to [the plaintiff], Helmsman and/or Lone Star or other insurers of Lone Star after the exhaustion of the [f]und . . . but only if such silicosis claims also allege latent bodily injury, sickness or disease alleged to arise out of [prepetition] exposure to free silica and in connection with Lone Star's [prepetition] sale of sand for blasting operations and/or in connection with the claimant's [prepetition] use of other silica related products or silica related operations."

zation, which resulted in the exhaustion of the fund by January, 2000. Between January 12, 2000, and August 31, 2005, the plaintiff has received notice of 29,000 subsequent silicosis claims against Lone Star, and has notified Lone Star of those claims.

The plaintiff asserts that it has continued to defend and indemnify these claims under a reservation of rights, but has paid millions of dollars to defend, administer or settle the subsequent silicosis claims. The plaintiff further alleges in its complaint that neither Lone Star nor the defendants have contributed to the cost of defending or indemnifying the plaintiff with respect to any of the subsequent silicosis claims.[8]

Similarly, numerous other claims have been made against Lone Star alleging latent bodily injury or sickness arising from the claimants' exposure to asbestos-containing products manufactured, sold or distributed by Lone Star. Neither Lone Star nor the defendants have contributed to the defense and indemnification costs with respect to these claims. Although the plaintiff insists that its responsibility is limited to a pro rata share, it asserts that it has continued to defend and indemnify Lone Star for these claims under a reservation of rights.

Against this factual background, the plaintiff brought this action seeking a declaratory judgment that: (1) the plaintiff's obligations with respect to the defense and indemnification of the subsequent silicosis claims under its policies and the 1994 settlement agreement are limited to its pro rata share of the costs, based on the applicable policy periods; (2) Lone Star is responsible under the 1994 settlement agreement for all additional premiums, deductibles and self-insured retentions under the policies arising from the subsequent silicosis

---

[8] Following the filing of this action, one of the defendants agreed to contribute a portion of the indemnity costs with respect to certain of the silicosis claims.

claims; (3) the defendants and/or Lone Star are responsible for the remaining defense and indemnity costs in excess of the plaintiff's obligations, and any amount payable for those claims should be reduced by Lone Star's pro rata share; (4) the plaintiff's obligations with respect to the defense and indemnification of the asbestos related claims are limited to its pro rata share of those costs on the basis of the policy periods responsive to the claimants' exposures and injuries; (5) the plaintiff has no obligation to defend or indemnify Lone Star with respect to any asbestos related claim arising from an exposure or injury after January 1, 1987; and (6) the defendants and/or Lone Star are responsible for the remaining defense and indemnity costs for the asbestos related claims asserted against Lone Star in excess of the plaintiff's obligations, with that amount being reduced by Lone Star's pro rata share.[9]

Thereafter, Lone Star filed an answer asserting numerous special defenses. Lone Star also asserted several counterclaims against the plaintiff, seeking, inter alia: (1) a declaration that the 1994 settlement agreement required the plaintiff to pay any and all subsequent silicosis claims up to the relevant insurance policy limits; (2) a further declaration that it had no liability to the plaintiff for any outstanding retrospective premiums or other charges; and (3) a determination as to the respective responsibilities of the plaintiff and the defendants with regard to the subsequent silicosis claims, to confirm that responsibility for handling and paying those claims rests with the carriers that issued policies for the years 1965–91; and (4) a declaration

[9] The plaintiff also sought: (1) damages from Lone Star for unpaid premiums and deductibles; (2) equitable contribution from the defendants based on their unjust enrichment with respect to the subsequent silicosis claims; (3) equitable contribution from Lone Star and the defendants based on their unjust enrichment with respect to the asbestos related claims; and (4) a declaration that the costs of defense and indemnity that the plaintiff had paid were fair and reasonable.

that Lone Star has no obligation to contribute to those defense or indemnity costs.[10]

Lone Star also filed a cross claim against the defendants, noting that the existence of the fund had delayed or suspended their obligations to contribute to the defense or settlement of silicosis claims, thereby suspending the erosion of the underlying policy limits during that time. Lone Star sought declarations that: (1) it has no additional obligation to contribute to the defense and indemnity costs for the subsequent silicosis claims; (2) the responsibility for paying the subsequent silicosis claims is established by the 1994 settlement agreement; (3) the responsibility for paying subsequent silicosis claims rests with those defendants that had issued policies for the years 1965–91; and (4) none of the defendants are entitled to seek contribution from Lone Star toward the cost of defending or paying subsequent silicosis claims.

Thereafter, Lone Star removed the case to the United States Bankruptcy Court for the District of Connecticut as related to its prior bankruptcy reorganization proceedings, and the case subsequently was transferred to the New York bankruptcy court. The plaintiff and Lone Star each subsequently moved to reopen the bankruptcy proceedings; the plaintiff sought a declaration that Lone Star had not been discharged from its silica related liabilities, and Lone Star sought to determine how silica related injury claims against it were to be handled under the 1994 settlement agreement. The New York bankruptcy court then reopened the case, and extensive discovery followed. While these proceedings were ongoing, the United States District Court for the District of Connecticut remanded this case back to the Connect-

---

[10] Lone Star also sought: (1) an accounting against the plaintiff with respect to the corpus of the fund; and (2) a claim for injunctive relief requiring the plaintiff to continue to defend and indemnify it against all silica and asbestos related claims asserted against it.

icut Superior Court, and it was transferred to the Complex Litigation Docket for the judicial district of Waterbury. The New York bankruptcy court then abstained from deciding this case other than granting the plaintiff's unopposed motion for a declaration that Lone Star had not been discharged from all liability for silicosis claims.

Thereafter, all parties moved for summary judgment at various points during the proceedings, and the motions were addressed in two memoranda of decision, one issued in December, 2005, and the other in January, 2007.[11] With respect to the December, 2005 decision, the trial court noted that summary judgment was appropriate because the parties had stipulated that there were no genuine issues of material fact. The court then concluded that it is "clear . . . that the [1994 settlement] agreement was never intended to release Lone Star completely from the subsequent silicosis claims," and, thus, that Lone Star "remains liable for all nonpremium obligations under the [plaintiff's] policies." The trial court also concluded that, under our decision in *Security Ins. Co. of Hartford* v. *Lumbermens Mutual Casualty Co.*, 264 Conn. 688, 826 A.2d 107 (2003), the plaintiff was responsible only for its "pro rata share of Lone Star's defense and indemnity costs." The trial court then denied Lone Star's motion for partial summary judgment and granted the plaintiff's motion for partial summary judgment, except for an interpretation of the plaintiff's policies with respect to asbestos related coverage.

With respect to the defendants, the trial court relied on *United States Fidelity & Guaranty Co.* v. *Treadwell*

---

[11] The trial court, *Schuman, J.*, initially had issued a scheduling order directing the parties first to litigate issues concerning the scope and effect of the 1994 settlement agreement, with other coverage issues to be decided later. The bifurcated motions for summary judgment reflect this scheduling order.

*Corp.*, 58 F. Sup. 2d 77 (S.D.N.Y. 1999), and character-ized the 1994 settlement agreement as one between an insured and one of its insurance companies, rather than "a global effort to resolve the silica related claims. None of the insurance companies, except [the plaintiff], were signatories to the agreement. Nor is there any compel-ling evidence that any of the [defendants] reaped the benefits of efficiency gains and reduced costs by [the 1994 settlement agreement]." Accordingly, the court granted the defendants' motions for partial summary judgment and denied Lone Star's motion for partial summary judgment, concluding that "[n]one of the [defendants] are bound by the 1994 [settlement] agreement or the methodology of payments employed therein."[12]

In the January, 2007 memorandum of decision, which addressed the claims that are at issue in this appeal, the trial court considered additional motions for partial and full summary judgment brought by the plaintiff, Lone Star and eighteen of the defendants.[13] The court began by clarifying, at the plaintiff's request, its 2005 ruling that the "pro rata method of allocation shall apply in this case, on a time on the risk calculation. [The plaintiff] has used the correct methodology in its calcu-lation. The coverage bloc and the companies involved,

[12] Lone Star thereafter filed an application pursuant to General Statutes § 52-265a seeking certification from the chief justice of an immediate expe-dited appeal from the partial judgment embodied in the 2005 memorandum of decision. Chief Justice Sullivan denied this application on December 29, 2005.

[13] The plaintiff argued that it was entitled to: (1) "a declaration that Lone Star is liable for all amounts paid by [the plaintiff] in excess of [the plaintiff's] pro rata share of defense and indemnity for silica and asbestos-related bodily injury claims against Lone Star, which costs have not been paid by Lone Star [or the defendants]"; (2) "an award of [$18,083,276] for the defense costs paid by [the plaintiff] in excess of its pro rata share"; and (3) an award of prejudgment interest. The plaintiff also moved for summary judgment with respect to an asbestos exclusion contained in a 1987 policy. The defendants sought full or partial summary judgment on the basis of the language in the specific policies that they had issued to Lone Star.

however, are subjects for future determination by a jury or trier of fact." The trial court then denied the plaintiff's motion for summary judgment with respect to its damages, noting that the reasonableness of its defense and indemnification costs presents a question of fact to be determined at trial. The trial court also stated that a material issue of fact precluding summary judgment exists as to whether Lone Star had assumed the liabilities of Texas Construction Materials Company (TCM), a company that it had purchased and dissolved in the late 1960s.[14] The trial court did, however, grant the plaintiff's motion for partial summary judgment with respect to the asbestos exclusion contained in its policies commencing in 1987.[15] The trial court concluded that the language of the exclusion was clear and unambiguous and, therefore, "[i]n view of the fact that the asbestos related claims either arise out of, or are related to asbestos, the 1987 policy and all subsequent . . . policies [issued by the plaintiff] with similar coverage do not provide coverage for the asbestos related claims." Lone Star does not appeal from this portion of the trial court's decision.

The trial court then turned to the merits of the defendants' coverage claims, which present the specific rulings that are at issue in this appeal.[16] Reviewing the

[14] This is a key question with respect to determining the pro rata allocation: if Lone Star had not assumed those liabilities, then it would be improper to include claims solely against TCM in the allocation of responsibility.

[15] The trial court noted that approximately 200 asbestos related lawsuits and other claims had been filed against Lone Star through August 31, 2005. The plaintiff allegedly had defended Lone Star on those asbestos related claims under a reservation of rights, paying out more than $550,000 in defense and indemnity costs on those claims without contribution from Lone Star.

[16] The trial court first noted that its December, 2005 decision had resolved all issues raised by Lone Star's cross claims, meaning that those allegations and the relief requested against the defendants no longer were part of the proceedings in this case. The court stated, however, that Lone Star still had standing to contest the defendants' summary judgment motions because their "presence . . . in the case may have an effect on the ultimate verdict and allocation of the pro rata costs."

language of the various policies, the trial court first addressed the claims of Travelers and Standard Fire. The trial court denied Travelers' motion for summary judgment to the extent that it had claimed that the policies had been issued to TCM rather than to Lone Star, noting that this claim implicated dissolution issues that it had previously found to raise issues of material fact. The court then noted that five Travelers policies, known as the XN policies, were issued directly to Lone Star from 1985–87, and that neither the plaintiff nor Lone Star had claimed that the asbestos related or subsequent silicosis claims would reach their very high attachment points. Thus, the trial court concluded that the dispute as to the Travelers XN policies was not ripe for review under *Milford Power Co., LLC* v. *Alstom Power, Inc.,* 263 Conn. 616, 822 A.2d 196 (2003), and, accordingly, granted partial summary judgment to Travelers on the ground of justiciability.[17] No appeal has been taken from this portion of the decision.

Turning to those insurer defendants who are participants in this appeal,[18] the trial court first granted the

[17] The trial court relied on its Travelers justiciability conclusion to grant the summary judgment motions filed by Republic and GEICO on the basis of their high level excess policies. Indeed, the court noted that the action would be withdrawn as to them, which has occurred. See also footnote 2 of this opinion.

[18] As for the other insurer defendants, the trial court denied Century's motion for partial summary judgment with respect to the TCM policies. The trial court granted Century's motion, however, with respect to the policies issued to Lone Star that contain a products hazard exclusion.

Similarly, the trial court denied the motion for summary judgment with respect to certain Lloyd's of London policies on the ground that there was an issue of material fact relating to whether Lone Star was a successor to TCM's liabilities. The trial court then addressed Lloyd's of London's claims pertaining to three policies issued to TCM from 1958–61, and granted its motion for summary judgment, concluding after reargument that the plaintiff could not maintain a declaratory judgment action against Lloyd's of London. Although Lone Star appealed from this ruling of the trial court, it has withdrawn those claims for lack of an appealable final judgment. See footnote 2 of this opinion.

The trial court denied the motion for summary judgment filed by Northern Assurance as to its excess policy, determining that there was an issue of

motion for summary judgment with respect to five poli-
cies that a group of insurers, collectively known as the
Hartford entities,[19] had issued to Lone Star.[20] The trial
court ruled similarly with respect to an excess umbrella
policy issued by National Casualty, which followed
form to an underlying Hartford Accident policy with a
clear silicosis exclusion. Additionally, the trial court
granted the motions for summary judgment filed by
Granite State, National Union, Lexington and American
Home, a group of insurers collectively known as the
AIG defendants, on the basis of their policies' asbestos
and silicosis exclusions.[21] Finally, the trial court granted
TIG's motion for summary judgment on the basis of the
"pollution hazard" exclusion language in two excess
umbrella policies issued by its predecessor, the Interna-
tional Insurance Company, and also granted the motion
for summary judgment filed by Agricultural Excess,
citing that policy's silicosis exclusion.

Lone Star appealed from the judgment of the trial
court to the Appellate Court, noting that a final judg-

fact as to whether the underlying policy issued by Highlands had been
exhausted with respect to "covered occurrences."

The trial court granted the motion for partial summary judgment filed by
Employers Insurance, concluding that the language of those five excess
policies clearly and unambiguously excluded asbestos and silicosis claims.
The action has been withdrawn as to Employers Insurance, which no longer
is party to this appeal. See footnote 2 of this opinion.

[19] The Hartford entities are, collectively, First State, Hartford Accident,
Hartford Casualty, New England and Twin City. Hereinafter, we refer to
them collectively as the Hartford entities and individually by name where
appropriate.

[20] The trial court also granted Zurich's motion for partial summary judg-
ment as to five excess policies that it had issued to Lone Star between 1985
and 1988. The court noted that those policies and their exclusions followed
form to the Hartford entities' policies upon which it earlier had granted
summary judgment.

[21] The trial court ruled similarly with respect to excess and umbrella
policies issued by First State and Federal that followed form to, and incorpo-
rated the terms of, the Granite State policy.

ment had entered as to fifteen of the defendants. See footnote 2 of this opinion. Lone Star's appeal raised issues arising from both the 2005 and 2007 memoranda of decision. The plaintiff and numerous defendants thereafter moved to dismiss the appeal, contending that it was untimely under Practice Book §§ 61-2[22] and 63-1[23] to the extent that it raised issues pertaining to the trial court's 2005 memorandum of decision, which had rendered a complete judgment on Lone Star's cross claim.[24] The Appellate Court granted these motions and dismissed these claims on appeal. Thereafter, we transferred the appeal to this court. See footnote 3 of this opinion.

[22] Practice Book § 61-2 provides: "When judgment has been rendered on an entire complaint, counterclaim or cross complaint, whether by judgment on the granting of a motion to strike pursuant to Section 10-44, by dismissal pursuant to Section 10-30, by summary judgment pursuant to Section 17-44, or otherwise, such judgment shall constitute a final judgment.

"If at the time a judgment referred to in this section is rendered, an undisposed complaint, counterclaim or cross complaint remains in the case, appeal from such a judgment may be deferred (unless the appellee objects as set forth in Section 61-5) until the entire case is concluded by the rendering of judgment on the last such outstanding complaint, counterclaim or cross complaint.

"If the judgment disposing of the complaint, counterclaim or cross complaint resolves all causes of action brought by or against a party who is not a party in any remaining complaint, counterclaim, or cross complaint, a notice of intent to appeal in accordance with the provisions of Section 61-5 must be filed in order to preserve the right to appeal such a judgment at the conclusion of the case."

[23] Practice Book § 63-1 provides in relevant part: "(a) Unless a different time period is provided by statute, an appeal must be filed within twenty days of the date notice of the judgment or decision is given. The appeal period may be extended if permitted by Section 66-1 (a). If circumstances give rise to a new appeal period as provided in subsection (c) of this rule, such new period may be similarly extended as long as no extension of the original appeal period was obtained. . . ."

[24] The defendants contended further that Lone Star's failure to appeal at the time of the 2005 memorandum of decision required it to defer any appeal from that ruling until the "entire case is concluded by the rendering of judgment on the last such outstanding complaint, counterclaim or cross complaint" under Practice Book § 61-2. See footnote 22 of this opinion.

The issues having been narrowed by the Appellate Court's dismissal order[25] and several postjudgment withdrawals of claims presented in the action; see footnote 2 of this opinion; Lone Star contends on appeal that the trial court improperly granted motions for summary judgment filed by: (1) Hartford Accident, Hartford Casualty, First State, Granite State and National Casualty since there was no pending case or controversy between Lone Star and those parties; (2) Hartford Accident, Hartford Casualty, Granite State and Lexington on the ground that those insurers failed to prove the existence or applicability of silica and asbestos related exclusions allegedly contained in the policies that they had issued; and (3) TIG and National Union on the basis of the improper construction of the pollution exclusions contained in their policies.[26] We address each of these claims in turn, and will set forth additional detailed facts and procedural history in the context of each claim.

"Before addressing [Lone Star's] arguments, we set forth the applicable standard of review of a trial court's ruling on motions for summary judgment. Summary judgment shall be rendered forthwith if the pleadings, affidavits and other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . The scope of our appellate review depends upon

[25] Lone Star conceded at oral argument before this court that the Appellate Court's dismissal order extends to its arguments pertaining to the effect of the 1994 settlement agreement, namely, those under point headings II and IV of its brief, concerning, respectively, the trial court's holdings that the codefendant insurers are not bound to recognize the terms and conditions of the 1994 settlement agreement and that the defense and indemnity costs were to be allocated on a pro rata basis, calculated from a time on the risk assessment. Accordingly, we do not consider the merits of these claims in this appeal.

[26] We note that Lone Star does not raise any claims in its brief with respect to the trial court's ruling as to Agricultural Excess. Accordingly, we need not address at this time the propriety of the trial court's decision with respect to that insurer.

the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . .

"In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) *Schilberg Integrated Metals Corp.* v. *Continental Casualty Co.*, 263 Conn. 245, 251–52, 819 A.2d 773 (2003).

I

Lone Star first claims that the trial court improperly granted the motions for summary judgment filed against it by three of the Hartford entities, namely, Hartford Accident, Hartford Casualty and First State, as well as by Granite State and National Casualty. Lone Star claims that this decision was improper because the 2005 memorandum of decision had completely disposed of its cross claim against the defendants, which meant that it no longer had a claim for relief against them as a result of the pleadings that remained in the case. Lone Star also argues, without citation, "that there is no basis in law or fact for concluding that the exclusion decisions should be binding on Lone Star in this or any

other proceeding."[27] In response, Travelers[28] contends that Lone Star is bound by the trial court's coverage rulings because the 2005 memorandum of decision eliminated only Lone Star's cross claim against the defendants, but not the plaintiff's claims against them. Joined by the Hartford entities, Travelers also notes that Lone Star is bound by the trial court's rulings because it participated actively in the proceedings before the trial court, including those related to the coverage issues. The Hartford entities add that Lone Star is bound by the trial court's rulings as a party to the declaratory judgment action, and emphasize that the trial court found that Lone Star had standing to argue the coverage issues, despite the fact that its cross claims had been dismissed, because "[t]he question of available coverage directly affects Lone Star—under Connecticut law, it will be responsible for any uninsured periods in the coverage block that are triggered by the underlying claims." See footnote 16 of this opinion. We agree with the defendants, and conclude that the trial court's determinations in this declaratory judgment action are binding on Lone Star.

---

[27] At oral argument before this court, Lone Star clarified its point and stated that, "to the extent any judgment was entered on those carriers' motions for summary judgment, that judgment should have entered solely against [the plaintiff] and not against Lone Star . . . ." Lone Star notes specifically that, at the time that summary judgment was rendered, there were no cross claims pending between it and the defendants, and that Lone Star's cross claim was out of the case by virtue of the 2005 memorandum of decision. Lone Star also emphasizes that procedurally, it was the plaintiff's "burden to establish that it was entitled to the judgment that it sought. It was not Lone Star's burden to establish coverage against its various carriers."

[28] Although the trial court concluded that the claims against Travelers were not justiciable, that insurer's policies followed form to those of the Hartford entities and incorporated their exclusions. Accordingly, Travelers has filed a brief in this appeal, joined by Century and Northern Assurance, in support of the Hartford entities' contention that its policies' exclusions govern because that ruling would provide an alternate basis for affirming the trial court's judgment as to Travelers.

Neither the parties' briefs nor our independent research reveals a case directly on point. The available authorities lead us, however, to conclude that a party that has been joined in a declaratory judgment action and has had the opportunity to litigate fully the subject matter at issue is bound by the court's declaration, notwithstanding the fact that its particular counterclaims or cross claims previously were eliminated from the case. See Practice Book § 17-58 ("[t]he decision of the judicial authority shall be final between the parties to the action as to the question or issue determined, and shall be subject to review by appeal as in other causes"). Moreover, both Connecticut and sister state case law in the area of collateral estoppel and res judicata[29] make clear that the trial court's determination in this case would be binding on Lone Star in a subsequent action. "It is not essential in the application of the doctrine of res [judicata], however, that a party to be bound by the former adjudication should have been a formal party thereto or privy to a formal party. It is sufficient if he, having an interest in the subject matter, participated openly and actively in so much of the former litigation

---

[29] "The doctrine of res judicata holds that an existing final judgment rendered upon the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction. . . . If the same cause of action is again sued on, the judgment is a bar with respect to any claims relating to the cause of action which were actually made or which might have been made. . . . Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum. . . . More specifically, collateral estoppel, or issue preclusion . . . prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties or those in privity with them upon a different claim. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered." (Citations omitted; internal quotation marks omitted.) *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 600–601, 922 A.2d 1073 (2007).

as led to the judgment adjudicating the cause of action in question." *Bridgeport Hydraulic Co.* v. *Pearson*, 139 Conn. 186, 198–99, 91 A.2d 778 (1952); id. (prior adjudication binding on person who, although not a formal party thereto, had appeared, filed motions and cross-examined witnesses); see also id., 199 ("where a person who is not formal party but who has an interest in the subject matter of a motion made in an action actively participates in the hearing on the motion, both he and his adversary are concluded by the decision thereon"); accord *Scottsdale Memorial Health Systems, Inc.* v. *Clark*, 157 Ariz. 461, 466, 759 P.2d 607 (1988) ("a judgment in an action against a mortgagor is not binding on the mortgagee unless it was made a party to the action or actively participated in the litigation"); *Antelope Co.* v. *Mobil Rocky Mountain, Inc.*, 51 P.3d 995, 1003–1004 (Colo. App. 2001) (collateral estoppel precludes party from relitigating contract interpretation from prior action because, although it had settled most claims in prior action, it remained a party to that action, its "counsel was present throughout the testimony . . . its interests were in alignment with the other defendant . . . and . . . both [defendants] had sufficient incentive to litigate vigorously the interpretation of the [a]greements"), cert. denied, 2002 Colo. LEXIS 576 (July 22, 2002); *Buechel* v. *Bain*, 97 N.Y.2d 295, 305, 766 N.E.2d 914, 740 N.Y.S.2d 252 (2001) (defendants who were parties to prior action involving their law partner in which fee agreement was construed "cannot be rewarded for their conscious, tactical decision not to take a more active role in that litigation by now allowing the very same issues and facts to be relitigated"), cert. denied, 535 U.S. 1096, 122 S. Ct. 2293, 152 L. Ed. 2d 1051 (2002). We therefore conclude that the trial court's coverage decisions are binding against Lone Star, which

has always been a party and an active participant in this declaratory judgment action.[30]

## II

We next address the claims pertaining to TIG, which present us at the outset with two subject matter jurisdictional questions to be addressed prior to considering the merits of the coverage issues under the policies. Specifically, Lone Star concedes, both in its reply brief and at oral argument before this court, that we lack jurisdiction over its appeal with respect to TIG because there is no final judgment, in that the trial court has never addressed two of the policies that TIG had issued. For its part, the plaintiff relies on *Milford Power Co., LLC* v. *Alstom Power, Inc.*, supra, 263 Conn. 616, and contends that both this court and the trial court lack subject matter jurisdiction over this portion of the declaratory judgment action because it is not ripe for resolution since there is " 'no suggestion' " that the claim amounts will approach the high attachment points of the excess policies issued by TIG. We conclude that Lone Star's appeal with respect to TIG must be dismissed for lack of a final judgment.

---

[30] Indeed, Lone Star all but conceded as much at oral argument before this court, when it acknowledged that, so long as the 2005 ruling that pro rata time on the risk would be the method of distributing the obligation to pay costs remains in effect, a determination in favor of one of the insurers on coverage matters essentially is one against Lone Star because it adds to its own responsibility. Further, Lone Star acknowledged that it would have been a necessary party to any proceeding intended to determine whether the plaintiff or any one of the defendants had coverage responsibilities for a given time period.

We acknowledge, however, the concerns of Lone Star, expressed at oral argument before this court, that it not be bound, for coverage purposes, by the plaintiff's withdrawal of the action against various of the defendants when the pro rata allocation subsequently is determined. See footnote 2 of this opinion. Although this is a valid concern, given Lone Star's lack of an opportunity to litigate fully this issue against these carriers as a consequence of the withdrawals, we note simply that this issue is not before us in this appeal.

The record reveals the following additional facts and procedural history. In the operative complaint, the plaintiff claimed that TIG, formerly known as International Insurance Company, had issued two policies to Lone Star, specifically, policy no. 522 034927 2, which covered January 1, 1983, through January 1, 1984, and policy no. 522 046802 7, which covered January 1, 1984, through January 1, 1985. TIG moved for summary judgment, contending that the pollution exclusions[31] contained in its policies barred coverage for silica and asbestos related claims. The trial court granted TIG's motion for summary judgment, relying on our decision in *Peerless Ins. Co.* v. *Gonzalez*, 241 Conn. 476, 697 A.2d 680 (1997), and concluding that silica and asbestos are "pollutants" within the meaning of the policies' broadly worded exclusion.

When Lone Star filed this appeal in February, 2007, it originally listed TIG as a defendant as to whom a final judgment had entered, because of the trial court's memorandum of decision in January, 2007, granting TIG's motion for summary judgment as to the two policies discussed specifically in the operative complaint. Subsequently, at a hearing before the trial court held in May, 2007, TIG's counsel represented to the trial court that it had issued two additional policies not mentioned specifically in the complaint or addressed in the 2005 memorandum of decision, and that it intended to move for summary judgment with respect to those policies, as well.

---

[31] The potentially applicable pollution exclusion is common to both TIG policies and defines "pollution hazard" as "includ[ing] bodily injury and property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this hazard does not include such injury or damage if such discharge, dispersal, release or escape is sudden and accidental."

We begin with Lone Star's final judgment claim because it poses issues pertaining specifically to this court's subject matter jurisdiction over this appeal, as compared to the jurisdiction of the trial court. See *Sullivan* v. *Thorndike*, 104 Conn. App. 297, 301, 934 A.2d 827 (2007) ("[w]e note that [the nonparty company's] absence as a defendant does not affect our jurisdiction over this appeal; see General Statutes § 52-263; and we are not precluded from addressing the issue of whether its absence may implicate the subject matter jurisdiction of the trial court"), certs. denied, 285 Conn. 907, 908, 942 A.2d 415, 416 (2008). Specifically, Lone Star contends that TIG's disclosure of two additional policies at the May, 2007 hearing has rendered the trial court's judgment with respect to TIG not final, thereby depriving this court of subject matter jurisdiction over Lone Star's appeal from that judgment. Lone Star notes that the plaintiff's complaint could be read as encompassing these two additional policies, not named specifically therein, because paragraph 75 provides broadly that "multiple insurers issued multiple layers of primary and excess coverage to Lone Star . . . for the years from at least 1958 to 1971, and from 1991 to 2003, including but not limited to the insurers and policies identified in [p]aragraphs 76 through 108 hereof." In response, TIG asks us not to accept this concession, and argues that there is an appealable final judgment because the trial court's memorandum of decision, which is consistent with the judgment file, indicates that the trial court disposed of the TIG related claims in their entirety.

"The lack of a final judgment implicates the subject matter jurisdiction of an appellate court to hear an appeal. A determination regarding . . . subject matter jurisdiction is a question of law . . . .

"The jurisdiction of the appellate courts is restricted to appeals from judgments that are final. General Stat-

utes §§ 51-197a and 52-263; Practice Book § [61-1] . . . . The policy concerns underlying the final judgment rule are to discourage piecemeal appeals and to facilitate the speedy and orderly disposition of cases at the trial court level. . . . The appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear. . . .

"Neither the parties nor the trial court, however, can confer jurisdiction upon [an appellate] court. . . . The right of appeal is accorded only if the conditions fixed by statute and the rules of court for taking and prosecuting the appeal are met." (Citations omitted; internal quotation marks omitted.) *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 33–34, 930 A.2d 682 (2007); id., 34 (dismissing appeal for lack of final judgment when parties entered into agreement that effectively put certain remaining claims "on hold" pending outcome of appeal).

Because the broad language of the operative complaint clearly encompasses the two additional TIG policies, which could not have been, and were not, addressed by the trial court, we conclude that a final judgment has not been rendered as to TIG.[32] Given the lack of a determination of appealability by the trial court and the chief justice or chief judge pursuant to Practice Book § 61-4 (a),[33] we agree with Lone Star's

---

[32] This appeal is not saved by the "general rule [that] jurisdiction once acquired is not lost or divested by subsequent events." (Internal quotation marks omitted.) *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 687, 899 A.2d 586 (2006), on remand, 102 Conn. App. 678, 926 A.2d 704 (2007); see also id., 687 n.13 (noting that mootness is exception to general rule). Although it appeared that a final judgment existed as to TIG when Lone Star filed this appeal in February, 2007, the trial court's learning of the two additional policies was not a "subsequent event" for purposes of this general rule because the policies themselves, as well as the operative pleading that encompassed them, both preexisted the filing of the appeal.

[33] Practice Book § 61-4 (a) provides: "Judgment not final unless trial court makes written determination and chief justice or chief judge concurs

"This section applies to a trial court judgment that disposes of at least one cause of action where the judgment does not dispose of either of the

concession, and conclude that its appeal with respect to TIG must be dismissed for lack of a final judgment.[34]

## III

We next turn to various claims on appeal with respect to the summary judgment motions brought by several of the defendants. "Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . If the terms of the

following: (1) an entire complaint, counterclaim, or cross complaint, or (2) all the causes of action in a complaint, counterclaim or cross complaint brought by or against a party. If the order sought to be appealed does not meet these exact criteria, the trial court is without authority to make the determination necessary to the order's being immediately appealed.

"This section does not apply to a judgment that disposes of an entire complaint, counterclaim, or cross complaint (see Section 61-2); and it does not apply to a trial court judgment that partially disposes of a complaint, counterclaim, or cross complaint, if the order disposes of all the causes of action in that pleading brought by or against one or more parties (see Section 61-3).

"When the trial court renders a judgment to which this section applies, such judgment shall not ordinarily constitute an appealable final judgment. Such a judgment shall be considered an appealable final judgment *only if* the trial court makes a written determination that the issues resolved by the judgment are of such significance to the determination of the outcome of the case that the delay incident to the appeal would be justified, and the chief justice or chief judge of the court having appellate jurisdiction concurs.

"If the procedure outlined in this section is followed, such judgment shall be an appealable final judgment, regardless of whether judgment was rendered on the granting of a motion to strike pursuant to Section 10-44, by dismissal pursuant to Section 10-30, by summary judgment pursuant to Section 17-44, or otherwise.

"A party entitled to appeal under this section may appeal regardless of which party moved for the judgment to be made final." (Emphasis in original.)

[31] We note, however, that in the subsequent proceedings before the trial court that will follow our dismissal of this portion of the appeal, the parties and the trial court would be well advised to consider whether the claims against TIG are justiciable. See part III E of this opinion.

policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning. . . . However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted. . . . [T]his rule of construction favorable to the insured extends to exclusion clauses." (Internal quotation marks omitted.) *Allstate Ins. Co.* v. *Barron*, 269 Conn. 394, 406, 848 A.2d 1165 (2004).

Put differently, "[a]lthough policy exclusions are strictly construed in favor of the insured . . . the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous. . . . The interpretation of an insurance policy is based on the intent of the parties, that is, the coverage that the insured expected to receive coupled with the coverage that the insurer expected to provide, as expressed by the language of the entire policy. . . . The words of the policy are given their natural and ordinary meaning, and any ambiguity is resolved in favor of the insured." (Citations omitted; internal quotation marks omitted.) *Wentland* v. *American Equity Ins. Co.*, 267 Conn. 592, 600–601, 840 A.2d 1158 (2004). The court must conclude that the language should be construed in favor of the insured unless it has "a high degree of certainty" that the policy language clearly and unambiguously excludes the claim. *Kelly* v. *Figueiredo*, 223 Conn. 31, 37, 610 A.2d 1296 (1992).

A

We begin with Lone Star's claims with respect to the policies of Hartford Accident and Hartford Casualty. Lone Star claims that the trial court improperly granted their motions for summary judgment because: (1) Hart-

ford Accident and Hartford Casualty failed to supply complete copies of the insurance policies at issue; (2) the "Silicosis Hazard Exclusion Endorsement" of the policies was not clear and unambiguous; and (3) questions of fact exist with respect to whether Lone Star had accepted the terms of those exclusions. We address each claim in turn.

1

Lone Star first claims that the trial court improperly granted the motions for summary judgment filed by Hartford Accident and Hartford Casualty because, written on the copies of the policies submitted in support of their motion was a proviso stating that " '[Hartford Accident] does not certify, warrant or represent that this is a complete copy of the policy.' " Lone Star argues that, without a complete copy of the policy or an explanation of what was missing, the trial court should not have granted the motion for summary judgment because of the well established proposition that insurance policies must be viewed in their entirety and because there was no evidence that the missing portions did not include contradictory endorsements or endorsement cancellations. In response, Hartford Accident and Hartford Casualty argue that we should not review this claim because Lone Star failed to raise it before the trial court, and the trial court had before it the complete relevant exclusionary language. We agree with the first point of Hartford Accident and Hartford Casualty and, thus, decline to review Lone Star's claim.

Subject to certain exceptions not applicable here,[35] it is well settled that we do not review claims that were not first raised before the trial court. See, e.g., *Intercity*

[35] See, e.g., *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 101, 861 A.2d 1160 (2004) (subject matter jurisdiction); *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) (unpreserved constitutional claims); Practice Book § 60-5 (plain error reversal).

*Development, LLC* v. *Andrade*, 286 Conn. 177, 187, 942
A.2d 1028 (2008). "[T]o review [a] claim, which has
been articulated for the first time on appeal and not
before the trial court, would result in a trial by ambus-
cade of the trial judge." (Internal quotation marks omit-
ted.) Id., 187–88. The record and Lone Star's briefs fail
to reveal any indication that this particular claim was
raised before the trial court. Inasmuch as raising this
claim before the trial court may well have resulted in
the rectification of the flaws in the record now relied
upon by Lone Star, we decline to review this claim for
the first time on appeal.

2

Lone Star next claims that the trial court improperly
granted the summary judgment motion filed by Hartford
Accident and Hartford Casualty because their policies'
"Silicosis Hazard Exclusion Endorsement" is not clear
and unambiguous since it refers to "silicon," rather than
the chemically distinct "silica," which, it argues, creates
different hazards. In response, Hartford Accident and
Hartford Casualty, supported by Travelers and Standard
Fire, whose policies follow form, contend that it is
undisputed that silica is a naturally occurring com-
pound of silicon and oxygen, and rely on *Peerless Ins.
Co.* v. *Gonzalez*, supra, 241 Conn. 476, for the proposi-
tion that the exclusion should be read broadly as
applying to silicon in all its forms. We agree with Hart-
ford Accident and Hartford Casualty.

We note briefly the following additional undisputed
facts and procedural history. The Hartford Accident
and Hartford Casualty policies provided only excess or
umbrella coverage for Lone Star. The relevant exclu-
sionary language of the three policies at issue[36] pro-

---

[36] The policies at issue provided $5 million in umbrella coverage for Janu-
ary 1, 1986, through January 1, 1987, $3 million in umbrella coverage and
$10 million for excess coverage for January 1, 1987, through January 1, 1988,
and $10 million in umbrella coverage for January 1, 1988, through January
1, 1989.

vides: "It is agreed that such insurance as is afforded by the policy is subject to the following additional exclusion:

"The company shall have no obligation under this policy:

"(1) To investigate, settle or defend any claim or suit against any insured alleging actual or threatened injury or damage of any nature or kind to persons or property which arises out of or would not have occurred but for the silicosis hazard; or

"(2) To pay, contribute to or indemnify another for any damages, judgements, settlements, loss, costs or expenses that may be awarded or incurred by reason of any such claim or suit or any such injury or damage, or in complying with any action authorized by law and relating to such injury or damage.

"As used in this endorsement, 'silicosis hazard' means . . .

"(A) An actual exposure o[r] threat of exposure to the harmful properties of *silicon*, or

"(B) The presence of silicon in any place, whether or not within a building or structure,

" 'Silicon' means the mineral in any form, including but not limited to fibers or dust." (Emphasis in original.)

The trial court concluded that "the term 'silicosis hazard' is clearly not limited to the disease silicosis . . . but rather extends to any bodily injury claims related to exposure to silicon in any form." The court also rejected Lone Star's argument with respect to the exclusions' use of the "broader term 'silicon' rather than the more narrow term 'silica,' " noting that Lone Star "agrees with the definition of 'silica' as a naturally occurring compound of silicon and oxygen and is the principal form of silicon found in nature. Thus, because silica

is but one form of silicon and because the [Hartford Accident and Hartford Casualty] silica exclusion clearly relates to silicon in all of its forms, the [Hartford Accident and Hartford Casualty] silica exclusion excludes coverage for bodily injury arising out of exposure to silica, as well as any other substance containing silicon."

We agree with the trial court's conclusion that the policy exclusion clearly and unambiguously bars coverage for the silica related claims against Lone Star. It is clear from the scientific materials submitted by Lone Star, and considered by the trial court, namely, the September, 2005 edition of the Pocket Guide to Chemical Hazards, published by, inter alia, the United States Department of Health and Human Services and the National Institute for Occupational Safety and Health, that amorphous or crystalline silica, also known as silicon dioxide, is a dust or powder that is a compound of two elements, namely, silicon and oxygen. Indeed, the entry for the element silicon notes specifically that it "[d]oes not occur free in nature, but is found in silicon dioxide (silica) and in various silicates." We therefore conclude that the use of the word "silicon" in the Hartford Accident and Hartford Casualty silicosis exclusion does not render the exclusion ambiguous, because silicosis and silica related hazards cannot exist in the absence of silicon, and the exclusion specifically defines "silicon" as "mean[ing] the mineral in any form." The breadth of this exclusion does not render it any less clear and unambiguous, and the trial court, therefore, properly granted the motions for summary judgment filed by Hartford Accident and Hartford Casualty. See *Peerless Ins. Co.* v. *Gonzalez*, supra, 241 Conn. 483 ("Because there is no requirement that a policy exclusion be cast in specific, rather than general, terms, the fact that the policy's lead exclusion contains no express reference to lead paint does not support [the insured's]

contention that lead paint falls outside the purview of the exclusion. The relevant inquiry is not whether the policy issued by [the insurer] expressly excludes lead paint from its coverage but, rather, whether the language of the exclusionary provision nevertheless clearly and unambiguously applies to lead paint.").

3

Finally, we consider Lone Star's claims that the trial court improperly concluded that there was no question of material fact with respect to whether Lone Star had accepted the exclusions embodied in two of the policies. Specifically, Lone Star contends that there was a genuine issue of fact as to whether it accepted the endorsement by signing either the endorsement or the declaration page of policy no. 10 HU SG4258. With respect to policy no. 10 XS SG5699, Lone Star contends that the trial court improperly concluded that Lone Star was required to submit an affidavit or other evidence to support what it argued was evident from the face of that policy, namely, that it had rejected the silicosis exclusion. In response, Hartford Accident and Hartford Casualty claim that Lone Star's acceptance of each policy and its exclusions is "clear and incontrovertible."

We first address Lone Star's claims with respect to policy no. 10 HU SG4258, which covered the period from January 1, 1986, through January 1, 1987. The trial court concluded that "[t]he fact that a representative of Lone Star did not sign the endorsement page to . . . policy no. 10 HU SG4258 does not create an issue of fact, since a representative did sign the declarations page. The endorsement specifically provides that 'if this endorsement takes effect as of the effective date of the policy and, at issue of said policy, forms a part thereof, countersignature on the declarations page of said policy by a duly authorized agent of the company shall constitute valid countersignature of this endorsement.' Thus,

Lone Star's signature on the declarations page of . . . policy no. 10 HU SG4258 constituted valid acceptance by Lone Star of the policy's silica endorsement."

Having reviewed the relevant documents in the parties' appendices, we agree with Lone Star that the trial court's conclusion with respect to policy no. 10 HU SG4258 simply was improper as a matter of fact. The countersignature space on the declarations page is blank, as is the silicosis exclusion endorsement, which, we note, stands in contrast to the signature of Lone Star's vice president for insurance on the asbestos exclusion endorsement. Accordingly, inasmuch as there is no other evidence cited by Hartford Accident and Hartford Casualty, other than references to nonexistent signatures, to support Lone Star's acceptance of the silicosis exclusion in policy no. 10 HU SG4258, the trial court improperly granted Hartford Accident and Hartford Casualty's motion for summary judgment with respect to that policy.

With respect to policy no. 10 XS SG5699, which covered the period January 1, 1987, through January 1, 1988, Lone Star argues that the trial court improperly granted the motion for summary judgment because there is a genuine issue of material fact as to whether Lone Star had accepted the policy, as evidenced by the strike through of the words "accepted by" next to the signature of its vice president for insurance and safety on the silicosis exclusion endorsement. The trial court rejected Lone Star's reliance on "what appears to be a mark on the copy of the endorsement" because of Lone Star's failure to "[attach] a supporting affidavit to this effect from a person with knowledge of the facts surrounding the purchase of the policy and/or the signing of the endorsement. Such a suggestion would infer that Lone Star could unilaterally accept or reject certain items of coverage without consulting the insurer. Certainly, any deletion of an exclusion would affect the

premium paid by Lone Star. Yet, there was no contention Lone Star paid an increased premium in return for a bargained for deletion of the exclusion."

We conclude that the trial court properly determined that there is no issue of material fact with respect to whether Lone Star had accepted the exclusion under policy no. 10 XS SG5699. Our review of the policy indicates that wherever an acceptance line was provided on an exclusion endorsement, namely, the pollution hazard, asbestos hazard and aircraft products exclusions, Lone Star's vice president for insurance signed his name in a similar manner, with the words "accepted by" stricken through. Thus, the signature on the silicosis exclusion was no different than the signature on any of the other exclusions. Moreover, the trial court properly noted, as a matter of common sense,[37] the fact that no party argued that the deleted exclusion or exclusions resulted in an increased premium amount vitiates Lone Star's argument, notwithstanding Lone Star's contention in its reply brief that no record support exists for this conclusion. Thus, we conclude that the trial court properly granted the motion for summary judgment with respect to policy no. 10 XS SG5699.

B

We next turn to Lone Star's claims relating to the AIG defendants, specifically, that the trial court improperly granted Granite State's motion for summary judgment because: (1) Granite State failed to produce its full policy during discovery and attached only the declarations page and asbestos hazard exclusion endorsement as exhibits to its motion; and (2) the endorsement is

[37] "It is an abiding principle of jurisprudence that common sense does not take flight when one enters a courtroom." (Internal quotation marks omitted.) *Gazo* v. *Stamford*, 255 Conn. 245, 266, 765 A.2d 505 (2001); id. ("[c]ommon sense also informs us that the plaintiff's contract claim is in reality his negligence claim cloaked in contract garb").

not clear or unambiguous with respect to whether it bars silica related claims.[38]

The record reveals the following additional relevant facts and procedural history. Granite State's policy provided $20 million in umbrella liability coverage for the period of December 31, 1984, through January 1, 1986. The exclusion endorsement at issue in this appeal is titled "Asbestos Exclusion Endorsement" and provides: "It is hereby understood and agreed that the insurance afforded by this policy shall not apply to:

"1. To any liability for property damage, personal injury, sickness, disease, occupational disease, disability, shock, death, mental anguish or mental injury at any time arising out of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to *asbestos, asbestos products, asbestos fibers or asbestos dust, silica dust*, or

"2. To any obligation of the insured to indemnify any party because of damage arising out of such property damage, personal injury, sickness, disease, occupational disease disability, shock, death, mental anguish or mental injury at any time as a result of the manufacture of, mining of, use of, sale of, installation of, removal of, distribution of or exposure to *asbestos, asbestos products, asbestos fibers or asbestos dust, silica dust*, or

"3. To any obligation to defend any suit or claims against the insured alleging personal injury or property damage and seeking damages, if such suit arises from personal injury or property damage resulting from or contributed to, by any and all manufacture of, mining

[38] The arguments set forth in this claim also apply to the policies of Federal, First State and Employers Insurance, which followed form to the Granite State policy. As noted at oral argument before this court, however, the plaintiff's claims against Employers Insurance and Federal have been withdrawn. See also footnote 2 of this opinion.

of, use of, sales of, installation of, removal of, distribution of, or exposure to *asbestos, asbestos products, asbestos fibers, asbestos dust or silica dust.*" (Emphasis added.)

In granting Granite State's motion for summary judgment, the trial court rejected Lone Star's claim with respect to the submission of only the two policy pages, stating that it was "satisfied . . . that a complete policy has been sent to all of the parties concerned. Therefore, on the basis of the prior ruling of the court [as to the policy of Employers Insurance], Granite State's motion for summary judgment is granted."

1

Lone Star first claims that the trial court improperly concluded that the complete Granite State policy had been sent to all parties, including Lone Star. Granite State contends in response that it forwarded a copy of that policy to all counsel via electronic mail, and has attached documents in its appendix to support that proposition. Granite State also argues that the failure to include the body of the policy should not defeat a motion for summary judgment premised on the terms of a clear and unambiguous exclusion endorsement because the endorsement alters the main policy terms.[39] We agree with Granite State that the body of the policy was not necessary for the disposition of this particular summary judgment motion.

---

[39] Granite State also relies on the plaintiff's failure to object to the introduction of the policy as precluding Lone Star's claim to that effect in this appeal, given the lack of a pending cross claim at the time of the 2007 summary judgment decision. Granite State further notes that the plaintiff "had perhaps the greatest incentive to object to the introduction of any policy which it believed to be incomplete or of questionable origin." We disagree. Given the binding effect on Lone Star of the trial court's declaratory judgment herein; see part I of this opinion; Lone Star properly may raise this claim both at the trial and at the appellate levels.

A review of Granite State's appendix indicates that the policy was not found in the insurer's central files after a search in September, 2006. The only documents provided in Granite State's appendix from that policy are a declarations page, a schedule of underlying insurance and twelve separate endorsements, including the asbestos hazard exclusion at issue in this appeal. The remainder of the policy provisions are not present.

We conclude that the trial court properly granted the summary judgment motion on the basis of the content of the exclusion or endorsement, notwithstanding Granite State's failure to provide the full policy provisions. "A rider or endorsement is a writing added or attached to a policy or certificate of insurance which expands or restricts its benefits or excludes certain conditions from coverage. . . . When properly incorporated into the policy, the policy and the rider or endorsement together constitute the contract of insurance, and are to be read together to determine the contract actually intended by the parties." (Citation omitted; internal quotation marks omitted.) *National Grange Mutual Ins. Co.* v. *Santaniello*, 290 Conn. 81, 93, 961 A.2d 387 (2009); see also *Schultz* v. *Hartford Fire Ins. Co.*, 213 Conn. 696, 705, 569 A.2d 1131 (1990) ("[i]n construing an endorsement to an insurance policy, the endorsement and policy must be read together, and the policy remains in full force and effect except as altered by the words of the endorsement" [internal quotation marks omitted]). Moreover, if the court concludes that the endorsement itself is clear and unambiguous, the content of the form policies themselves is irrelevant for purposes of the motion because " '[e]ndorsement' has also been defined generally to mean '[a] written or printed form attached to the policy which alters provisions of the contract,' " and the "word 'alter' is synonymous with 'change.' " *Schultz* v. *Hartford Fire Ins. Co.*, supra, 703. Even a policy provision that contradicts directly the terms of

the endorsement is irrelevant to the disposition of the summary judgment motion.[40] See id., 705 ("[i]f any irreconcilable conflict exists between provisions of the policy and provisions of an endorsement, then the latter must control" [internal quotation marks omitted]). Thus, if the court concludes that the exclusion via endorsement is clear and unambiguous, then the insurer will have carried its "burden of proving an exclusion to a risk otherwise generally insured against . . . ." *Souper Spud, Inc.* v. *Aetna Casualty & Surety Co.*, 5 Conn. App. 579, 585, 501 A.2d 1214 (1985), cert. denied, 198 Conn. 803, 503 A.2d 172 (1986); accord *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.*, 259 Conn. 527, 550–51, 791 A.2d 489 (2002) (insurer has burden of proving applicability of policy exclusion, but insured has burden of proving applicability of exception to that exclusion). Accordingly, we conclude that Granite State's failure to supply the policy provisions, other than the exclusionary endorsements, does not necessarily mean that the trial court improperly decided the summary judgment motion.

2

We next address Lone Star's claim that "there is a serious question concerning whether any reasonable insured would have understood the exclusion to bar coverage for silica related claims" because "[t]he refer-

---

[40] We emphasize that our decision on this claim is based on the facts and insurance policy provisions presented by this case, and that the appropriate policy provisions generally are indispensable to the resolution of a summary judgment motion in a coverage dispute. See *Safeco Ins. Co. of America, Inc.* v. *Wood*, 948 S.W.2d 182, 184 (Mo. App. 1997) (insurer "has not met its burden to establish the applicability of an exclusion or that the policy did not cover [insured] under general coverage provisions for [the] whole period encompassed by [the] lawsuit" when it failed to attach relevant policies to its summary judgment motion); see also *Hasselstrom* v. *Rex Chainbelt, Inc.*, 50 Wis. 2d 487, 491–92, 184 N.W.2d 902 (1971) (stating in dicta that insurer's motion for summary judgment was defective because of its failure to include entire insurance policy with its motion).

ence to 'silica dust' is hidden in an 'asbestos exclusion endorsement.' " Granite State contends in response that the term "silica dust" is not hidden because it is in plain view, in the same font size as the rest of the endorsement and appears in all three paragraphs. We agree with Granite State that the endorsement clearly and unambiguously excludes silica related claims.

"In determining whether the terms of an insurance policy are clear and unambiguous, [a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. . . . This rule of construction may not be applied, however, unless the policy terms are indeed ambiguous." (Citations omitted; internal quotation marks omitted.) *Connecticut Medical Ins. Co.* v. *Kulikowski*, 286 Conn. 1, 6, 942 A.2d 334 (2008).

Bearing in mind the fact that Lone Star is a sophisticated commercial entity; see, e.g., *Kinsey* v. *Pacific Employers Ins. Co.*, 277 Conn. 398, 407, 891 A.2d 959 (2006); we conclude that there is nothing ambiguous about the language of the exclusion endorsement itself, which states three times that it excludes coverage for damage, injury or illness claims "aris[ing] from . . . silica dust." Although the *title* of the exclusion doubtless would be clearer and more useful if it were entitled "Asbestos *and Silica* Exclusion Endorsement," rather than "Asbestos Exclusion Endorsement," this does not render the language of the endorsement itself ambiguous. Moreover, the term "silica dust" is not buried in

the endorsement, and indeed appears at the end of the respective paragraphs, rather than in the middle of them. The parties' briefs and our independent research having failed to yield any authority holding to the contrary, we conclude that the trial court properly granted Granite State's motion for summary judgment.

## C

We next address a concession of error with respect to American Home, another of the AIG defendants. We note at the outset that Lone Star does not raise any claims with respect to American Home, and the only mention of American Home in Lone Star's opening brief is in the statement of facts and proceedings, which acknowledges that the trial court granted American Home's motion for summary judgment as to all of its four policies at issue, which covered annual periods from December 31, 1999, through December 31, 2003. We note, however, that American Home has conceded that the trial court improperly granted its motion for summary judgment with respect to the first three of the four policies at issue herein. Accordingly, we reverse that portion of the trial court's judgment and direct it on remand to deny American Home's motion for summary judgment with respect to its policies covering the following periods: December 31, 1999, through December 31, 2000; December 31, 2000, through December 31, 2001; and December 31, 2001, through December 31, 2002.[41]

---

[41] We note that there is a division of authority in the trial courts as to whether, under Practice Book §§ 10-26 and 17-51, and *Telesco* v. *Telesco*, 187 Conn. 715, 718–19, 447 A.2d 752 (1982), a court is limited to rendering summary judgment on an entire count in a complaint, rather than having the flexibility to render summary judgment on one or some of the multiple causes of action contained in a single count in that complaint. Compare, e.g., *Fiamengo* v. *Great American Ins. Co.*, Superior Court, judicial district of Hartford, Docket No. CV-00-0802480-S (November 16, 2004) ("[i]t is not possible to render summary judgment on part of a count of a complaint" [internal quotation marks omitted]) with, e.g., *Pelletier* v. *Sordoni/Skanska Construction Co.*, Superior Court, judicial district of Waterbury, Complex

## D

Lone Star next contends that the trial court improperly granted National Union's motion for summary judgment in its entirety because, inter alia, that insurer's motion did not pertain in its entirety to all of the policies identified in the plaintiff's complaint. At oral argument before this court, National Union's counsel conceded that its motion pertained to only twelve of the fifteen policies that it had issued to Lone Star, and thus, that it remains in the case still pending. On the basis of this concession, we reverse the judgment of the trial court with respect to National Union and remand the case for further proceedings. Because, however, the partial motion for summary judgment as to National Union, coupled with the lack of a determination of appealability by the trial court and the chief justice or chief judge pursuant to Practice Book § 61-4 (a); see footnote 33 of this opinion; means that there is no final judgment with respect to that insurer, we decline to address the merits of Lone Star's remaining claims as to National Union.

## E

Lone Star also contends that the trial court improperly granted Lexington's motion for summary judgment with respect to one of its policies, specifically policy no. 556-5258. Specifically, Lone Star argues that Lexington failed to produce a copy of its insurance policy covering

Litigation Docket, Docket No. X06-CV-95-0155184-S (May 5, 2005) ("Practice Book § 17-51 . . . authorizes the entry of summary judgment on part of a claim within a single count provided final judgment can be entered with respect to that part of the claim and it can be severed from the remainder of the claim"), rev'd on other grounds, 286 Conn. 563, 945 A.2d 388 (2008). We need not address this division of authority because the parties have not claimed that the reversal requested by American Home presents an impermissible partial summary judgment, and the claims at issue are readily divisible within the single count because they arise from discrete insurance policies.

the period from January 1, 1989, through January 1, 1990, or an affidavit concerning its terms, and produced only a binder and cover note. In response, Lexington argues that Lone Star has not put forth any evidence that the asbestos and silicosis exclusions do not exist, and also posits, as an alternate ground for affirmance, that the claims against it are not justiciable because of their attachment points of $20 million in excess of the primary coverage.

With respect to the Lexington policy, the trial court granted Lexington's motion for summary judgment in its entirety on the basis of its conclusion that "Lexington issued a series of excess liability policies to Lone Star for the period of January 1, 1993, through January 1, 1995. These policies sit atop umbrella liability policies issued by [National Union] during the same period. These policies contain a similar exclusion for damages arising out of silica dust. In addition, Lexington issued an excess umbrella liability policy to Lone Star for the period of January 1, 1989, to January 1, 1990. This policy contains both an 'asbestos' exclusion and a 'silicosis' exclusion."

Addressing Lexington's justiciability argument first because it is subject matter jurisdictional in nature, we note that Lexington contends that the grant of summary judgment should be affirmed on the alternate ground that the claims against it were not ripe under *Milford Power Co., LLC* v. *Alstom Power, Inc.*, supra, 263 Conn. 616, because Lexington's attachment point was $20 million in excess of the primary coverage, and because the trial court had found not ripe claims against Travelers that involved its XN excess policies with only a $10 million attachment point. In response, Lone Star argues, without providing specific information, that there remain disputed issues of fact with respect to the amounts paid for the defense and indemnity of the underlying claims, the appropriate trigger period and

the erosion of the underlying coverage. Lone Star also notes that the trial court's conclusion with respect to the Travelers XN policies with high attachment points has not yet been tested on appeal because of the procedural posture of this case.

"Although this court has not defined expressly the precise relationship between ripeness and justiciability, it is well settled in the federal courts that ripeness is one of several justiciability doctrines, including standing and mootness. . . . For purposes of this appeal, it suffices to state that . . . ripeness is a sine qua non of justiciability . . . .

"An issue regarding justiciability, which must be resolved as a threshold matter because it implicates this court's subject matter jurisdiction . . . raises a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . . Jurisdiction of the subject-matter is the power [of the court] to hear and determine cases of the general class to which the proceedings in question belong. . . . A court has subject matter jurisdiction if it has the authority to adjudicate a particular type of legal controversy. . . . [O]nce the question of lack of jurisdiction of a court is raised, [it] must be disposed of no matter in what form it is presented . . . and the court must fully resolve it before proceeding further with the case. . . . If it becomes apparent to the court that such jurisdiction is lacking, the appeal must be dismissed. . . .

"The plaintiff . . . sought the trial court's jurisdiction over its declaratory judgment action pursuant to § 52-29, which, as we have recognized, provides a valuable tool by which litigants may resolve uncertainty of legal obligations. . . . The [declaratory judgment]

procedure has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances. . . . A declaratory judgment action is not, however, a procedural panacea for use on all occasions, but, rather, is limited to solving justiciable controversies. . . . Invoking § 52-29 does not create jurisdiction where it would not otherwise exist. . . .

"As we noted in *Pamela B.* v. *Ment*, 244 Conn. 296, 323–24, 709 A.2d 1089 (1998), [w]hile the declaratory judgment procedure may not be utilized merely to secure advice on the law . . . or to establish abstract principles of law . . . or to secure the construction of a statute if the effect of that construction will not affect a plaintiff's personal rights . . . it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof. Practice Book § [17-55]. . . . Finally, the determination of the controversy must be capable of resulting in practical relief to the complainant. . . .

"In deciding whether the plaintiff's complaint presents a justiciable claim, we make no determination regarding its merits. Rather, we consider only whether the matter in controversy [is] capable of being adjudicated by judicial power according to the aforestated well established principles." (Citations omitted; internal quotation marks omitted.) *Milford Power Co., LLC* v. *Alstom Power, Inc.*, supra, 263 Conn. 623–26.

Thus, we acknowledge "the rationale of the ripeness requirement, [which is] to prevent the courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements," and note that "we must be satisfied that the case before the court does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire." (Internal quotation marks omitted.) Id., 626; see also id., 627 (declaratory judgment action not ripe when "defendants never maintained that they were entitled to more time or money to perform their obligations as a result of the claimed force majeure event" and "[t]he hypothetical nature of the dispute is apparent, because any issue about the rights and obligations of the parties is still abstract until the defendants assert an entitlement").

Numerous courts have concluded that, for a declaratory judgment coverage action involving an excess policy to be ripe, it must be practically or reasonably likely that the insured's potential liability will reach into the excess coverage; absolute proof that the policies will be triggered is not required. See, e.g., *E.R. Squibb & Sons, Inc.* v. *Lloyd's & Cos.*, 241 F.3d 154, 177–78 (2d Cir. 2001); *Raytheon Co.* v. *Continental Casualty Co.*, 123 F. Sup. 2d 22, 30–31 (D. Mass. 2000) (adopting report and recommendation of magistrate); *DiCocco* v. *National General Ins. Co.*, 140 P.3d 314, 316 (Colo. App. 2006); *Hoechst Celanese Corp.* v. *National Union Fire Ins. Co. of Pittsburgh*, 623 A.2d 1133, 1137 (Del. Super. 1991); *UMC/Stamford, Inc.* v. *Allianz Underwriters Ins. Co.*, 276 N.J. Super. 52, 67, 647 A.2d 182 (1994); *Long Island Lighting Co.* v. *Allianz Underwriters Ins. Co.*, 35 App. Div. 3d 253, 826 N.Y.S.2d 55 (2006), appeal dismissed, 9 N.Y.3d 1003, 880 N.E.2d 877, 850 N.Y.S.2d 391 (2007). Moreover, the "worst case or highest estimate of damages . . . may be used to ascertain whether or not a claim is justiciable against a particular excess insurer's policy . . . ." (Citations omitted; inter-

nal quotation marks omitted.) *Long Island Lighting Co.* v. *Allianz Underwriters Ins. Co.*, supra, 253–54.

We cannot conclude that we lack subject matter jurisdiction over the claims against Lexington solely on the basis of the assumption that, if coverage will not attach under the Travelers XN policies, then excess liability coverage similarly will not be triggered under the even higher attachment points of the Lexington policies. Most importantly, we note that the policies covered different time periods, with the Lexington policies covering from January 1, 1993, through January 1, 1995, and the Travelers XN policies covering from January 1, 1985, through January 1, 1987. The policies also were subject to different underlying coverage.

Conversely, we cannot conclude that we *do* have subject matter jurisdiction, as neither our review of the record nor Lexington's brief points to any evidence that the subsequent silicosis claims allocable to its particular time periods are reasonably likely to trigger the excess coverage. Thus, to ensure that there is a ripe controversy, we remand the case to the trial court so that the parties may introduce evidence and that court may rule in the first instance whether it is reasonably likely that the Lexington policies' excess coverage will be triggered. See Practice Book § 60-2 (appeals "court may, on its own motion or upon motion of any party . . . [9] remand any pending matter to the trial court for the resolution of factual issues where necessary"); see also *State* v. *Ryder*, 111 Conn. App. 271, 277, 958 A.2d 797 (2008) (remanding case to trial court pursuant to Practice Book § 60-2 [9] for evidentiary hearing on whether defendant had paid fine voluntarily because "record is insufficient for us to determine whether the appeal is moot"); cf. *Darien* v. *Estate of D'Addario*, 258 Conn. 663, 677 n.15, 784 A.2d 337 (2001) (remand not required when jurisdictional facts are undisputed with respect to mootness issue). The parties' subsequent appellate

remedies will, therefore, be dependent on the trial court's fact dependent conclusion whether the claims as to Lexington's policies are justiciable. Accordingly, we decline to consider the merits of the claims with respect to Lexington until they are determined to be justiciable.

The judgment is reversed in part and the case is remanded to the trial court with direction: (1) to deny in part the motions for summary judgment filed by Hartford Accident, American Home and National Union; (2) to determine whether the coverage claims against Lexington are justiciable; and (3) for further proceedings according to law. The appeal is dismissed with respect to TIG. The judgment is affirmed in all other respects.

In this opinion the other justices concurred.